**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.** _____

JONATHAN LOPEZ

      Plaintiff,

v.

CHASE HERRO, a/k/a CHASE HERO

      Defendants.

_____ /

**VERIFIED COMPLAINT**

Plaintiff JONATHAN LOPEZ ("Plaintiff" or "Jonny") sues Defendant CHASE HERRO,

a/k/a CHASE HERO ("Defendant" or "Chase") and states as follows:

**PARTIES JURISDICTION AND VENUE**

1.      Plaintiff Jonathan Lopez is an individual *sui juris*, domiciled in the State of Florida.

2.      Defendant Chase Herro a/k/a Chase Hero is an indivual *sui juris*, domiciled in

Puerto Rico.

3.      This is an action for damages in excess of $75,000.00 (exclusive of interest,

attorney's fees and costs).

4.      This Court has subject matter jurisdiction over the claims herein pursuant to 28

U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there is complete

diversity of citizenship between Plaintiff and Defendant.  Plaintiff is domiciled in and is a resident

of Florida; Defendant is domiciled in and is a resident of Puerto Rico.

5.      Venue is proper in this district under 28 U.S.C § 1391 because Defendant conducted

business in this District, a significant part of the events or omissions giving rise to these claims

Pardo Law PLLC · 1205 Lincoln Road · Suite 211 · Miami Beach, Florida  33139

took place in this District, and because Defendant has engaged in substantial and not isolated activity in this District.

6. This Court has personal long arm jurisdiction over Defendant pursuant to Florida Statute 48.193(1)(a)(1) because Defendant —itself and through its agent(s)—operated, conducted, engaged in, and carried on a business or business venture in this State.

7. This Court has personal long arm jurisdiction over Defendant pursuant to Florida Statute 48.193(1)(a)(1) because Defendant owns, manages, and operates businesses in the State of Florida (e.g., without limitation, BOCA BRIDGES LOT 0255, LLC and CH STORAGE, LLC), through an entity owns real property in the State of Florida (17224 Brulee Breeze Way Boca Raton, Florida 33496), has retained local counsel in the State of Florida, and has thereby submitted himself to the jurisdiction of the courts of this State.

8. This Court has personal long arm jurisdiction over Defendant pursuant to Florida Statute 48.193(1)(a)(2) because Defendant committed tortious acts within the State of Florida (as more particularly described herein)

9. Personal jurisdiction over Defendant meets the minimum contacts or due process requirements such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice because (i) Defendant has operated and conducted significant business in Florida, including purchasing, operating, and selling real estate in Florida; (ii) Defendant travels to and from Florida as part of his normal business operations; (iv) modern methods of transportation and communication (e.g., Zoom and other video conferencing platforms) reduce significantly any burden on Defendant to litigate in the State of Florida; and (iii) The State of Florida has a strong interest in seeing this matter resolved in Florida.

10.     Any conditions precedent to bringing this action have been performed, have occurred, have been waived, or have otherwise been excused by Defendant's course of conduct.

## FACTS COMMON TO ALL COUNTS

11.     Plaintiff Jonny Lopez is an entrepreneur who, among other things, holds cryptocurrency, including Etherium ("ETH").

12.     The term "cryptocurrency" or "crypto asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology.

13.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." The system relies on cryptographic techniques for secure recording of transactions.

14.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

15.     A "wallet" is a piece of hardware or software on which crypto asset owners typically store the cryptographic key information providing them control over their crypto assets. Crypto wallets offer a method to store and manage critical information about crypto assets, i.e., cryptographic information necessary to identify and transfer those assets.

16.     A "smart contract" is a software or code that, based on programmable conditions, is deployed and run on a blockchain.

17.     Defendant Chase Herro (who sometimes goes by Chase Hero) is also a serial ETH trader.

18.     Among other things, Chase proudly broadcasts his ETH holdings to the public.

19.     Chase also promotes himself as the biggest "dirtbag on the internet."[1]

20.     In and around April 2024, Chase Hero founded, wrote the code for, and launched an online cryptocurrency platform called *Dough Finance.*

21.     Dough Finance was a so-called decentralized finance ("DeFi") project that provided financial services on the Ethereum blockchain and utilized blockchain-based smart contracts (i.e., programs run on a blockchain) to facilitate investment opportunities for investors.

22.     Dough Finance functioned like a crypto asset investment fund that utilized blockchain-based smart contracts and other coding to receive and deploy investors' assets.

23.     Dough Finance charged users a 5% fee for any moneys deposited in the fund.

24.     An investor's depositing of money onto Dough Finance constituted the offer and sale of investment contracts and, thus, a security.

25.     On or about April 17, 2024, Dough Finance launched and maintained a website: dough.finance ("Website").

26.     Upon information and belief, Chase wrote the code and copy for (and was ultimately responsible for) the Website.

27.     Chase marketed Dough Finance to investors through direct communications, the public Website, public interviews, and through social media (e.g., Instagram, Twitter, YouTube, and others).

---

[1] *See https://www.nytimes.com/2024/10/07/us/politics/donald-trump-crypto-2024-campaign.html; see also https://www.bloomberg.com/news/features/2024-09-13/behind-the-trump-crypto-project-is-a-self-described-dirtbag-of-the-internet?embedded-checkout=true; see also https://financialpost.com/fp-finance/cryptocurrency/trump-crypto-guru-self-described-dirtbag-of-internet*

28.     Through public statements, and direct communications, Chase invited Jonny to reasonably expect that he would earn money and profits from Chase's efforts and, specifically, Dough Finance's proprietary platform.

29.     In mid-2024, Chase induced Jonny to invest in and on Dough Finance.

30.     Insodoing, Chase made several misrepresentations to Jonny about:

    (i)    **Dough Finance's liquidity** (that it had millions of dollars worth of ETH in reserves and millions of U.S. Dollars in "available liquidity;"

    (ii)    **Dough Finance's security** (that any cryptocurrency transacted in the Dough Finance marketplace was 100% secure because it was stored on the blockchain); and

    (iii)    **Jonny's investment liquidity** (that any cryptocurrency stored by Jonny using Dough Finance was 100% liquid, at any time).

31.     In one example, Chase made the following representation to Jonny about how his investment in Dough Finance would be so secure as to amount to an "escrow":

> ***There is liquidity at any time, anywhere, always, because the money is on the chain with escrow. . . The money is locked on the chain where only you can get it out.***

32.     In another example, Chase shared screen shots of millions of dollars of online bank transfers – ostensibly to demonstrate to Jonny that Dough Finance was receiving investments from other sophisticated investors and that Dough Finance was well capitalized (which, as it turns out, was a complete lie).

33.     In another example, Jonny specifically inquired of Chase what the liquidity on the Dough Finance platform was.

34.     Chase specifically represented – on Dough Finance's Website – that the liquidity was over Seven Hundred Million ($700,000,000) Dollars, that Chase had "over $3b in supplies," and that "300m is our [i.e., Dough Finance and Chase's] money g[.]"

35.     Against the backdrop of these representtions, Chase flaunted via text message and reaffirme his control and ownership of Dough Finance:

*What you think I built some stupid toy lol*

36.     In inducing Jonny's money, Chase repeatedly characterized any moneys that Jonny put onto Dough Finance as an "investment."

37.     Chase flouted how Jonny was "guaranteed" to make money on Dough Finance.,

38.     Chase also explained to Jonny that he could exploit Chase's crytpo-trick called "looping."

39.     According to Chase, looping involves arbitrarily inflating the amount of ETH that your Dough Finance account reflects, borrowing against that ETH (as if you were the Federal Reserve, specifically because Dough Finance ostensibly had so much liquidity and reserves) – and re-investing the ETH in other crypto-investments to pump your investment portfolio.

40.     Chase sent Jonny text messages, voice messages, and was on several FaceTime calls with Jonny to walk him through, step-by-step, how to "loop" on Dough Finance for purposes of exploiting the crypto-markets.

41.     In one example, Chase texted Jonny that he should "show me once you're done [looping, and] I'll confirm it's right."

42.     Chase said that he personally uses his looping mechanism in order to "circumvent tax exposure."

43.     The Website contains "How To" guides that Chase promoted to Jonny.

Pardo Law PLLC · 1205 Lincoln Road · Suite 211 · Miami Beach, Florida  33139

44.     The Dough Finance Website contained step-by-step guides for "Creating your Wallet" "Buy cryptocurrencies" "Supply" "Withdraw" "Borrow" "Repay" "Swap" "Loop" and "Deloop."

45.     The Dough Finance Website also contained an entire page dedicated to "Risk Management."  A copy of the splash page, as it existed on or about April 17, 2024, is attached as **Exhibit A**.

46.     The Risk Management splash page contains descriptions of Dough Finance using the typical badges of a securities investment, including but not limited to "yield" "liquidity" "liquidating positions" "leveraging assets" "investment flexibility" and "maximized returns":

## Yield Money Multiplier Effect in Dough Finance with Delooping Strategy

Dough Finance allows users to maximize their returns by leveraging their collateral through looping and delooping strategies. The platform ensures liquidity and debt repayment by pre-liquidating positions early, thanks to an additional 5% borrowing fee. The treasury uses USDC to buy WETH for small accounts, ensuring they remain covered.

### Benefits of Borrowing vs. Drawing Profits

- **Leveraging Assets:** By borrowing against your assets instead of selling them, you can continue to earn yields on the full value of your supplied assets. For example, if you supply 100K USD worth of assets, you can borrow up to 70K USD without losing the ability to earn yields on the original 100K USD.
- **Tax Efficiency:** Borrowing can be more tax-efficient than selling assets and drawing profits, as borrowed funds are generally not considered taxable income.
- **Investment Flexibility:** With the borrowed funds, you can hedge your investments, reinvest in other opportunities, or loop ETH to maximize your returns.

### Treasury Management

- **Small Account Coverage:** The treasury uses USDC to buy WETH for small accounts, ensuring they remain covered and fully liquidated when necessary.
- **Perpetual WETH Purchase:** This strategy ensures the Dough Finance bank always stays liquid and repays its debt efficiently.

### Conclusion

Dough Finance's yield money multiplier effect, combined with strategic looping and delooping, allows users to maximize their returns while maintaining a safe HF. By adhering to the borrowing and liquidation thresholds, users can effectively manage their risk and ensure the security of their positions. The frontend buffer provides an additional safety net, preventing transactions that could potentially crash due to insufficient HF. Furthermore, the treasury's strategy of using USDC to buy WETH for small accounts ensures that Dough Finance remains liquid and capable of covering all debts, ensuring a robust and sustainable DeFi experience.

47.    The Website's materials were grossly misleading.

48.    At no timd did Chase provide Jonny with a Regulation D Offering, Offering Memorandum, Private Placement Memorandum, Offering Circular, Subscription Agreement, or any other document to inform Jonny of the risks of his investment.

49.    Notwithstanding all the foregoing, Chase promised that Jonny's investment would be "very lucrative."

50.    In May 2024, and based on the many representations made by Chase, Jonny invested approximately $1MM worth of ETH onto Dough Finance.

51.    During the time that Jonny invested on Dough Finance, Chase was monitoring Jonny's investment and complimenting him along the way.

52.    In one example, Chase commented via iMessage how Jonny's investment was "[u]p 20% but really you're up 40% in your principal."

53.    In another example, Chase commented via iMessage: "[w]e get reward [sic] for the risks we take Lfg."

54.    Just about one month later, on July 12, 2024, Dough Finance suffered a "flash loan" attack and Jonny's investment disappeared.  Gone. Vanished into the ether (pun intended).

55.    On July 30, 2024, shortly after Jonny's investment disappeared, Jonny documented his present sense impression to Chase that he had been duped.

56.     As it turns out: each and every promise and representation that Chase made to Jonny was a complete lie -- a ruse by Chase to pump the liquidity on Dough Finance's platform.

57.     After the hack, and even after Chase promised to made Jonny whole, Dough Finance's Website shut down abruptly, ne'er to reopen.

58.     Upon information and belief: none of the liquidity that Dough Finance supposedly had actually existed.

59.     Upon information and belief, Chase has altered or manipulated Dough Finance's code and/or cache in order to alter certain *Terms and Conditions* which never existed on Dough Finance's website.

60.     However, shortly after the "flash loan attack" Chase was on social media and other platforms flaunting wealth (e.g, new cars, watches, and other accessories).

61.     Shortly after Jonny's ETH disappeared from *Dough Finance*, Chase personally accepted responsibility to make Jonny whole; he  agreed to "take care of it" and reimburse Jonny approximately 300 ETH.

62.     Chase then reneged, refusing to honor his commitment.

63.     Chase (operating through Dough Finance), purported to give the Dough Finance "community" the ability to vote like a shareholder on certain governance decisions affecting Dough Finance's reimbursement efforts.

64.     Dough Finance tweeted that over 250 Million votes were cast on the matter.  Upon information and belief, no such voting took place.

65.     On October 8, 2024, Jonny (through counsel) sent Chase a pre-suit demand.

66.     Chase failed to meaningfull respond to the demand.

67.     Since then, Jonny's lost ETH has skyrocketed in value.

## COUNT I: NEGLIGENT MISREPRESENTATION

68.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 67 as if fully set forth herein.

69.     This is an action for negligent misrepresentation.

70.     Chase made material misstatements of fact to Jonny, to wit:

(i)     **Dough Finance's liquidity** (that it had millions of dollars worth of ETH in reserves and millions of U.S. Dollars in "available liquidity;"

(ii)    **Dough Finance's security** (that any cryptocurrency transacted in the Dough Finance marketplace was 100% secure because it was stored on the blockchain); and

(iii)   **Jonny's investment liquidity** (that any cryptocurrency stored by Jonny using Dough Finance was 100% liquid, at any time).

71.     In furtherance thereof, Chase claimed to Jonny that a key feature of Dough Finance was that it was "guaranteed" to have liquidity and that blockchain-based smart contract technology and programming ensured that Jonny's money was "100% secure".

72.     In furtherance thereof, Chase advised Jonny how to "loop" his ETH and how to navigate Dough Finance to ensure the best financial outcome.

73.     Chase either knew or reasonably should have known that his representations, recommendations, advice and instructions were improper, inaccurate, or wrong.

74.     Chase either knew or reasonably should have known that his failures to disclose material information to Jonny was improper and wrong and would mislead Chase.

75.     As the founder of Dough Finance, Chase owed Jonny a duty to correctly state all facts regarding Dough Finance.

76.    Regardless of privity, Jonny was a foreseeable person for whom the information about Dough Finance was intended, either directly or indirectly, and thus a duty was owed by Chase to Jonny directly.

77.    Jonny reasonably relied upon Chase's misrepresentations and advice.

78.    Chase's negligent and grossly negligent misrepresentations were a proximate cause of the Jonny's damages.  In reasonable reliance on Chase's advice regarding Dough Finance, Jonny: (1) paid substantial sums to participate in Dough Finance; (2) paid substantial fees to the Dough Finance (and, presumably, to Chase); (3) lost his entire investment; and (4) missed the opportunity to hold or invest the ETH (which has risen in value since Jonny's loss).

**WHEREFORE**, Plaintiff respectfully requests judgment in his favor and against Defendant, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT II: BREACH OF FIDUCIARY DUTY

79.    Plaintiff repeats and realleges the allegations contained in paragraph 1 through 67 as if fully set forth herein.

80.    Chase, as the founder of Dough Finance, the receiver of moneys invested on Dough Finance, and the person who walked Jonny through (in direct communication) how to use Dough Finance, Chase became Jonny's fiduciary. Jonny placed his trust and confidence in Chase.

81.    Chase had influence and superiority over Jonny and his investment on Dough Finance.

82.    Thus, Chase owed Jonny the duties of honesty, loyalty, care, and compliance with

the applicable securities laws.

83.    As a proximate cause of the foregoing, Jonny has been injured in an actual amount to be proven at trial.

84.    In reasonable reliance on Chase's advice regarding Dough Finance, Jonny: (1) paid substantial sums to participate in Dough Finance; (2) paid substantial fees to the Dough Finance (and, presumably, to Chase); (3) lost his entire investment; and (4) missed the opportunity to hold or invest the ETH (which has risen in value since Jonny's loss).

85.    As a result of Chase's breach of fiduciary duties, Chase should be required to disgorge all payments received from Jonny in connection to Dough Finance.

**WHEREFORE**, Plaintiff respectfully requests judgment in his favor and against Defendant, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT III: FRAUD

86.    Plaintiff repeats and realleges the allegations contained in paragraph 1 through 67 as if fully set forth herein.

87.    In order to induce Jonny's participatation in Dough Finance and pay substantial fees and other monies to Dough Finance and Chase, Chase directly and indirectly, through himself and others, made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Jonny, as set forth above and the following:

(iv)    **Dough Finance's liquidity** (that it had millions of dollars worth of ETH in reserves and millions of U.S. Dollars in "available liquidity;"

(v)   **Dough Finance's security** (that any cryptocurrency transacted in the Dough Finance marketplace was 100% secure because it was stored on the blockchain); and

(vi)   **Jonny's investment liquidity** (that any cryptocurrency stored by Jonny using Dough Finance was 100% liquid, at any time).

88.   In furtherance thereof, Chase claimed to Jonny that a key feature of Dough Finance was that it was "guaranteed" to have liquidity and that blockchain-based smart contract technology and programming ensured that Jonny's money was "100% secure".

89.   In furtherance thereof, Chase advised Jonny how to "loop" his ETH and how to navigate Dough Finance to ensure the best financial outcome.

90.   The above affirmative misrepresentations and/or intentional omissions of material fact made by Defendants were false when made, and the Defendants knew these representations to be false when made with the intention that Jonny would rely upon them participate in Dough Finance, pay substantial funds to participate in Dough Finance, and pay substantial fees to the Chase and his co-operators.

91.   In reasonable reliance on the false affirmative misrepresentations and intentional omissions of material facts regarding Dough Finance, Jonny did in fact participate in Dough Finance and place millions of dollars on the platform, paid substantial sums to participate in the Dough Finance, paid substantial fees to Chase and others, and lost his money altogether.

92.   But for Chase's intentional misrepresentations and material omissions described above, Jonny would not have participated in Dough Finance, paid substantial sums to participate in Dough Finance, or paid substantial fees to Chase and others in connection with Dough Finance.

93.   As a direct and proximate result of Chase's conduct set forth herein, Jonny has been

damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT IV: VIOLATION OF
### FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

94.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 67 as if fully set forth herein.

95.     This is an action for violation of the Florida Securities and Investor Protection Act. §§ 517.011-517.32, Fla. Stat.

96.     Plaintiff's investment and other financial activity on *Dough Finance* amounted to a purchase of a security interest within the definition contained in Section 517.021, Fla. Stat.

97.     Through Dough Finance's public website, social media channels, and direct communications, Chase solicited Jonny deposit crypto assets into and borrow crypto assets from and on the Dough Finance platform.

98.     Chase promoted Dough Finance by touting its purported security and "guaranteed" liquidity.

99.     Based on the facts set forth above, an investor's purchase of an interest in these opportunities—which occurred by the investor depositing money, in the form of crypto assets, into the Dough Finance platform with a guarantee of security and return—constituted the offer and sale of investment contracts and thus securities.

100.    Jonny (like other innocent investors on Dough Finance) tendered money, in the

form of crypto assets, to the Dough Finance platform to participate in the "pools" of investors whose crypto assets were then combined by smart contracts and made available for borrowing or "looping."

101.    Users who borrowed crypto assets paid interest to the pools they borrowed from.

102.    A portion of those interest payments, in turn, constituted the returns that were paid to pool investors who had deposited their crypto assets in the pools, while another portion of the interest payments was earned by the Dough Finance protocol in the form of a commission or fee.

103.    The returns earned by Dough Finance pool investors arose from the activities of the pools, which were facilitated by the smart contracts, in lending the crypto assets and receiving interest from that lending activity.

104.    In this way, each pool investor's fortunes were tied to the fortunes of the pool's other investors.

105.    Through Chase's public statements and the economic structure of Dough Finance, Chase invited Jonny to be a Dough Finance investor who would reasonably expect that he would earn profits derived from Chase's efforts (operating Dough Finance).

106.    In connection with the offer and sale of the security interest, Defendant made untrue statements to obtain money and property from Plaintiff.

107.    In connection with the offer and sale of the security interest, Defendant omitted material facts necessary for Plaintiff to property consider the security transaction, and in doing so obtained money and property from Plaintiff.

108.    In connection with the offer and sale of the security interest, Defendant engaged in a course of conducted which operated as a fraud and/or deceit upon Plaintiff, and in doing so obtained money and property from Plaintiff.

109.     In connection with the offer and sale of the security interest, Chase acted as an unregistered broker.

110.     Dough Finance was offered to Jonny and sold as an investment, and Chase made use of various means and instrumentalities of interstate commerce to offer and sell an interest in the profits from Dough Finance.

111.     Chase never filed a registration statement with the SEC for Dough Finance's sale of securities. No exemption from registration applied.

112.     Chase personally benefited from Jonny's investment, including without limitation the 5% fee charged on Jonny's deposit of funds.

113.     Through its misconduct, Defendant committed numerous violations of Seciton 517.301(1), Fla. Stat.

114.     Plaintiff is entitled to the remedies contained within Sections 517.211 and 517.241(3), Florida Statutes.

115.     Pursuant to Section 517.211(6), Florida Statutes, Plaintiff is entitled to recovery from Defendant the reasonable amount of Plaintiff's attorneys' fees and costs.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated: January 27, 2025

        Respectfully submitted,

        **PARDO LAW PLLC**
        1205 Lincoln Road, Suite 211
        Miami Beach, Florida 33139
        Telephone: (305) 308-7388
        Email: joe@pardolawmiami.com

        By: */s/ Joseph I. Pardo, Esq.*
          Joseph I. Pardo, Esquire
          Florida Bar No. 1003339

## VERIFICATION

Under penalty of perjury, I declare that I have read the foregoing Verified Complaint and the facts alleged therein are true and correct to the best of my knowledge and belief.

By: _____

Name: Jonathan Lopez

Pardo Law PLLC · 1205 Lincoln Road · Suite 211 · Miami Beach, Florida 33139