## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:25-cv-20405-JB

JONATHAN LOPEZ

     Plaintiff,

v.

CHASE HERRO, a/k/a CHASE HERO

     Defendant.

_____ /

### PLAINTIFF JONATHAN LOPEZ'S VERIFIED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, MOTION TO DISMISS [ECF NO. 10]

Plaintiff JONATHAN LOPEZ ("Plaintiff" or "Jonny"), by and through undersigned counsel, responds in opposition to Defendant CHASE HERRO, a/k/a CHASE HERO ("Defendant" or "Chase") *Motion to Compel Arbitration, or, in the Alternative, Motion to Dismiss* [ECF No. 10].  In support, Plaintiff states as follows:

### Introduction and Factual Overview

Jonny Lopez filed his *Verified Complaint* [ECF No. 1] against Chase Herro for **Negligent Misrepresentation** (Count I); **Breach of Fiduciary Duty** (Count II); **Fraud** (Count III); and **Violation of Florida's Securities and Investor Protection Act** (Count IV).  Each cause of action is sufficiently pled and dismissal on either the federal notice or the Rule 9(b) heightened pleading standard is unwarranted.  That part of the Motion which seeks to compel arbitration is also improper because the 'browsewrap' agreement that the Motion relies upon is unenforceable under Florida law.

Jonny Lopez was defrauded by Chase Herro into investing millions of dollars onto the *Dough Finance* crypto platform.  Compl. ¶¶ 86-93.  In order to induce Jonny's investment, Chase made material misrepresentations about Dough Finances' liquidity, the security the platform, and Jonny's ability to liquidate his crypto investment at any time.  Compl. ¶ 87.  Jonny specifically alleges both reasonable reliance, *see* Compl., ¶¶ 78, 84, 91, and proximate causation.  *See* Compl., ¶¶ 78, 83, 84, 85, 91, 93.  The totality of the circumstances also demonstrates that, **but for** Chase's lies about the security and liquidity of *Dough Finance*, Jonny never would have put millions of dollars worth of cryptocurrency onto the platform.  Compl., ¶ 92.

To be sure: these were not made up, pie-in-the-sky representations by Chase Herro.  These were acutal and material misrepresentations that Chase made in writing or via recorded audio message and sent directly to Jonny to induce his investment onto *Dough Finance*.  By way of example: the following are verbatim transcripts of two separate audio recordings that Chase sent to Jonny via iMessage which demonstrate the very specific promise of lucrative returns and the security of *Dough Finance*.

> ***If your goal here with this, and it should be, I'm assuming that's what it is, is just go in, 2x your fucking ETH, and chill.  When the price starts going up and you gotta bunch more liquidity in there, you can be like oh I'm gonna borrow some money from it and fuck off, or I'm going to loop some more, you know what I'm saying?***  But right now, you can just, you know, supply and then make your loop. Keep it simple.
>
> […]
>
> I want to say I'm very proud of you. You're learning actually rather quickly.  So, uh, to answer everything, correct.  ***So: the second you supply and you go in and 2x  your thing youre gonna, you're going to double the amount of etherium***, and then you're going to have, you know, the equivalent of half, right 'cause you double of debt in USDC.  So, the very simple answer is: yes, you can continue borrowing. Right?  Be very careful of that because with your current statement, you know, you only have roughly fifty percent of liquidity, minus liquidation threshold.   So it'll tell you what your health score.  So just watch that.  So I wouldn't really borrow much of it, um, right, you know, uh, that  until you start going up, right? So like for

me, I kind of do like a multitude of things.  I have like, multiple positions.  So like, one is like my loop position, where I'm just trying to get as many ETH as I can safely for the ride up to make a shit ton of money.  Another account I will build is like my buying shit account, right?  So I'll be putting stables and/or ETH in the supply, and I'll be borrowing so that I, I'm buying things tax free, right?  That's a really big caveat, right?  If you're international company supplying these assets and you're borrowing to your domestic account, you're essentially circumventing your tax exposure because of debt.  Obviously talk to your accountant to make sure you're going through all the right channels but it's a very lucrative, uh, avenue there.  For me, that's why I do it.  I borrow debt constantly from my company so I don't have tax exposure.  Um, so yes.  You can supply, you can do everything.  Once your, once its done I mean everything will continuously work constantly.  So like, say you wanted to de-loop tomorrow you just hit the de-loop button and it de-loops the fucking position, right?  You're gonna lose fees and shit, you know, and maybe a little decay on this, on a position maybe like, fractions of a percent.  You know, point 0-0-1 percent in your fucking transaction back from ETH and shit, you know, that's gonna happen, right?  But, uh, no.  ***You have liquidity at any time, anywhere, always, because its connected to the chain like their escrow. The money is locked on the chain where only you can get it out.***

Compl. ¶¶ 31, 40, 42.  In addition to these verbatim audio recordings:

- Chase sent a screen shot purporting to show ***millions of dollars of capital injections*** into Dough Finance.  Copml., ¶ 32, *See* Resp., Ex. A.

- Chase walked Jonny through the "looping" procedure step-by-step, via text message and FaceTime video conference.  Copml., ¶ 40, *See* Resp. Ex. B.

- Chase confirmed ***hundreds of millions of dollars in liquidity*** on Dough Finance. Compl., ¶ 34,  *See* Resp. Ex. C

- Chase commented via iMessage how Jonny's investment was "[u]p 20% but really you're up 40% in your principal."  Compl. ¶¶ 51-52; *See* Resp. Ex. D.

- In another example, Chase commented via iMessage: "[w]e get reward [sic] for the risks we take Lfg." Compl. ¶ 53; *See* Resp. Ex. E.

- Even after the flash loan attack, Chase represented to Jonny that the money was still "on chain" and that he would "take care of it."  *See* Resp. Ex. F

**Memorandum of Law**

## I.    DOUGH'S "POLICY" IS AN UNENFORCEABLE BROWSEWRAP AGREEMENT; THE ARBITRATION CLAUSE IS NOT BINDING ON JONNY

### A.    Legal Standard: Defendants' Initial Burden.

*Daudreau v. My Pillow, Inc.* summarizes the lens through which the Court analyzes the enforceability of arbitration agreements: state law contract principles apply; pertinent here, Defendant (the party seeking enforcement) has the burden of establishing an enforceable arbitration agreement:

> In construing arbitration agreements, courts apply state law principles relating to contract formation, interpretation, and enforceability. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005). "The party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists." *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019); *Palm Garden of Healthcare Holdings, LLC v. Haydu*, 209 So. 3d 636, 638 (Fla. 5th DCA 2017). To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove offer, acceptance, consideration, and sufficient specification of essential terms. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

*Daudreau v. My Pillow, Inc.*, 6:21-cv-1899-CEM-DAB, 2022 WL 3098950 at * 3 (M.D. Fla. July 1, 2022); *see also JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018) ("a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.")(quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) ("State law governs the interpretation and formation of such [arbitration] agreements.") (citing *Perry v. Thomas*, 482 U.S. 483 (1987)).  "To find an arbitration agreement exists, the Eleventh Circuit requires proof indicating personal knowledge of the conduct manifesting assent of the party upon whom enforcement is sought." *My Pillow,* 2022 WL 3098950 at * 5 (citing *Bazemore v. Jefferson Capital Systems, LLC*, 827 F.3d 1325, 1327 (11th Cir. 2016)).

**B.      The *Policy* Attached to the Motion is a Generally Unenforceable 'Browsewrap'
Agreement**

**1.      Clickwrap versus Browsewrap Agreements.**

The State of Florida recognizes two types of internet agreements: clickwrap agreements
and browsewrap agreements. See *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla.
3d DCA 2018) (citing *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2018)).
A clickwrap agreement occurs when a user must click a checkbox to acknowledge that the user
has read the relevant terms and conditions before the user can continue.  *See Vitacost.com,* 210 So.
3d at 762.  A browsewrap agreement occurs when a website provides a link to the terms and
conditions but does not require the user to click a separate acknowledgement checkbox before
continuing. *Id; see also Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla.
2021) (A browsewrap agreement is "when a website merely provides a link to the terms and
conditions and does not require the purchaser to click an acknowledgement during the checkout
process. The purchaser can complete the transaction without visiting the page containing the terms
and conditions.") (quoting *Bell v. Royal Seas Cruises, Inc.*, No. 19-cv-60752, 2020 WL 5742189,
at *5 (S.D. Fla. May 13, 2020)).

Through his Motion, Defendant ostensibly seeks to enforce a 'browsewrap' agreement.
Assuming the Policy that was hyperlinked to the *Dough Finance* website is valid (it is not), it is
undisputed that it would be a browsewrap agreement because a user of *Dough Finance* "is not
required to affirmateively consent to [its terms and conditions] before being allowed access to the
Website or prior to making a purchase through the Website."  *See Fridman*, 554 F. Supp. 3d at
1259.  Browsewrap agreements are generally not enforceable.  *Vitacost.com*, 210 So. 3d at 762.
Therefore, enforcement of arbitration pursuant to a brosewrap agreement is an exception, not the
rule.  *See id.*

C.   **The Policy is Invalid Because (1) Jonny Was Not on "Actual Notice" of Its Terms, and because (2) the Hyperlink to the Policy's Terms Was Not Conspicuous Enough to Put Jonny on Inquiry Notice That It Contained an Arbitration Clause**

1.   **Jonny Was Not on Actual Notice of the Policy's Terms**

A browsewrap agreement is enforceable "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Fridman*, 554 F. Supp. 3d at 1260 (quoting *Bell*, 2020 WL 5742189, at *5. The Motion fails to satisfy either condition. Like in *Fridman*, Jonny never saw the *Policy* attached to the Motion prior to filing this lawsuit, did not know that they included an arbitration agreement, and never agreed to the Policy's terms or to arbitration any dispute with Chase Herro related to Dough.[1] The Declaration attached to Defendant's Motion does not evidence that Jonny was on actual notice of the Policy's terms, or that Jonny actually viewed the Policy. *See generally*, [ECF No. 10-1]. Nor can it.

In these circumstnaces, the Court should find no agreement for arbitration exists between the parties. *See, e.g., My Pillow*, 2022 WL 3098950 at *4-5; *Herman v. Seaworld Parks & Ent., Inc.*, No. 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *3 (M.D. Fla. Aug. 26, 2016) (where the plaintiff contends she never consented to an arbitration provision contained in a website's terms and conditions, there was no "clear and unmisteable evidence" that the parties agreed to arbitrate) (citing *Chastain v. The Robinson-Humphrey Co.*, 957 F. 2d 851, 854 (11th Cir. 1992)). The Court should therefore find that Jonny was not on actual notice of the Policy at the time Chase made misrepresentations to Jonny or when Jonny invested on and used the *Dough Finance* platform.

---

[1] The Motion mistakes the "How To" pages referenced in the Complaint with the Policy attached to the Motion. They are different, and Jonny maintains that the *How Tos* are consistent with the representations that Chase made to Jonny. By comparison, the How To pages ***do not*** reference or contain the Policy in any way. The 'only' place that there appears an arbitration clause is the Policy, which is neiether mentioned in or referenced in the Complaint – because Jonny never saw it prior to filing suit.

Accordingly, the Court can only enforce the browsewrap agreement if it determines "whether the hyperlink to the Terms was sufficient to place Plaintiff on constructive notice of the arbitration . . . provisions." *Fridman*, 554 F. Supp. 3d at 1260.

> **2.** **The Hyperlink Was Not Conspicuous Regarding Arbitration; Jonny Was Not on Constructive Notice of Any Arbitration Terms**

For situational awareness, this is the *Dough Finance* splash page Defendant relies on:



[ECF No. 10-1] at 2.  This is what the page looks like when a user wants to use the "looping" feature:



*Id.* at 3.  There is no mention on either page of an arbitration agreement.  Nor is there any obvious indication that the Policy is hyperlinked (let alone what 'Policy' even refers to, *e.g.,* privacy, insurance).

Absent actual notice, browsewrap agreements "have only been enforced when the hyperlink to the terms and conditions is conspicuous enough to place the user on inquiry notice." *My Pillow, Inc.*, 2022 WL 3098950 at *4 (quoting *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. 4th DCA 2017)) (upholding denial to compel arbitration based on "browsewrap" agreement during sale); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)) (holding that the "conspicuousness and placement" of the hyperlink and "the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement").  "Uniformly, courts have declined to enforce 'browsewrap' agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them." *Id.*

Use of the *Dough Finance* website alone is insufficient to bind Jonny to the *Policy*'s terms. *See Fridman*, 554 F. Supp. 3d at 1264 ("Defendant asserts that Plaintiff assented to the Terms by using the Website and relies upon *Brueggemann v. NCOA Select Inc.* is incorrect. No. 08-80606-CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 2009). However, this reliance is misplaced."); *Goldstein v. Fandango Media, LLC*, 9:21-cv-80466-RAR, 2021 WL 6617447 (S.D. Fla. July 27, 2021) (rejecting Defendants argument that use of the website was an assent to the arbitration clause contained in a hyperlinked "Terms and Policies" page).  Even if it was, the lack of any language next to the *Dough Finance* Policy which clearly indicates that the *Policy* contains an arbitration clause is summarily fatal to its enforcement. *See Fandango,* 2021 WL 6617447 at * 3 ("Fandango's

notice is deficient because of its placement on the webpage and because the notice fails to alert the user of the arbitration agreement.") (applying *Bell*, 2020 WL 5742189).

On the *Dough Finance* website, like in *Friman*, the hyperlink to the Policy was not "prominent or particularly remarkable," *Fridman*, 554 F. Supp. 3d at 1261-62, because it (i) appears on the bottom of the website; (ii) in small font; (iii) in the same size and color as the rest of the content on the site; (iv) is not clearly a hyperlink; and (v) does not have any indication that it contains an arbitration provision.

The Motion and supporting Declaration make no showing that the use of the *Dough Finance* website "required [Jonny] to actually view or agree to the Terms." *Fridman*, 554 F. Supp. 3d at 1264. Accordingly, the location of the *Policy* alone is sufficient for the Court to find a lack of constructive notice. *Id.* at 1264 (citing *Herman v. Seaworld Parks & Ent., Inc.*, No. 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *6 (M.D. Fla. Aug. 26, 2016) (denying motion to compel arbitration, specifically finding no constructive notice); *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C*, 975 F. Supp. 2d 1267, 1282-83 (S.D. Fla. 2013) (finding no mutual assent to the terms of a browsewrap agreement, where the hyperlink to the terms was located at the bottom of each webpage and there was insufficient notice that downloading items from the website would bind users to the agreement).[2]

"In the context of web-based contracts, clarity and conspicuousness are a function of the design and content of the relevant interface." *Fridman*, 554 F. Supp. 3d at 1260. "[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it . . . Because 'online

---

[2] In *Allday Consulting*, the Court (Hon. Robert Scola) adopted the Report and Recommendation of the Magistrate Judge, which found insufficient evidence that the browsewrap terms existed <u>at the time plaintiff</u> used the website. *Allday Consulting*, 975 F. Supp. 2d 1267, 1281. Undersigned notes that the *Policy* attached to the Motion [ECF No. 10-1] is dated **January 16, 2025**, well after the date Jonny was fraudulently induced into investing on *Dough Finance*.

providers have complete control over the design of their websites,' 'the onus must be on website owners to put users on notice of the terms which they wish to bind customers[.]" *Freedom Valiente v. Nexgen Global, LLC,* (quoting *Berman v. Freedon Fin. Network, LLC,* 30 F.4th 849, 856–57 (9th Cir. 2022); *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16 (2021) and *Nguyen*, 763 F.3d at 1179)).

The Court here should distinguish the placement and content of *Dough Finance*'s Policy—in black and white and with no mention of arbitration—with the browsewrap agreement in *Bell v. Royal Seas Cruises, Inc*., (for which the Court found the hyperlink conspicuous enough to at least provide inquiry notice of arbitration):



*Bell*, 2020 WL 5742189 at *1.  In *Bell,* the placement of the hyperlinked Terms and Conditions was above a large, green button; and, the browsewrap made absolutely clear that the Terms and Conditions contained a "mandatory arbitration policy." *Id.*  By comparison, the browsewrap on *Dough Finance* contains no written notice whatsoever, and does not describe the hyperlinked Policy in any way (let alone that it contains a mandatory arbitration clause).  That omission alone

is fatal to enforcement of the Policy. *See Fandango*, 2021 WL 6617447 at *4 ("Unlike the notice in *Bell*, which specifically stated that its Terms and Conditions 'include[ ] mandatory arbitration,' Fandango's notice only contains a hyperlink to its Terms and Policies without referencing the arbitration agreement at all. Therefore, Fandango's notice does not indicate, much less 'sufficiently describe,' the collateral Arbitration Agreement that is contained in its Terms and Policies.")

Similarly: the placement of the *Dough Finance Policy* in a black and white text box (not clearly hyperlinked) ***could not*** put Jonny on sufficient notice of an arbitration agreement. *Valiente v. Nexgen Global, LLC*, 22-cv-22480-ALTMAN/Reid, 2023 WL 6213583 at * 9 (S.D. Fla. Sept. 25, 2023) ("While it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists.") (quoting *Berman*, 30 F.4th at 857); *see also Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002) (C.J. Sotomayor) (finding that a reasonably prudent person may not be aware of a notice of license terms below a download button; *Fandango*, 2021 WL 6617447 at *3 ("Moreover, the comparatively miniscule size of the typeface used to notify the purchaser that he is agreeing to certain 'Terms and Policies' and its light grey color render it practically unreadable."); *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 980–981 (E.D. Cal. 2000) (finding that there was no mutual assent as a matter of law when notice of a license agreement were in small gray font because website users may not be aware of the license agreement).

[Continued on following page]

The Court should find *Valiente v. Nexgen Global, LLC* instructive.  In *Valiente*, the Court (Hon. Roy K. Altman) denied Defendant's Motion to Compel Arbitration.  2023 WL 6213583, at * 1.  The browsewrap agreement at issue included a hyperlink to the Defendant's "Terms of Use" at the bottom of all pages of the website.  *Id.*  The view of the hyperlink on the website (like in *Dough Finance*) was in black-and-white and at the bottom of the page:



*Id.*  "If [Plaintiff] had clicked on the Terms of Use, he would have seen that, 'by accessing the Company Website, you agree to abide by the Terms of Use and Privacy Policy." *Id.* (cleaned up). The Terms of Use, in turn, contained a "Dispute Resolution" section which bound the user to resolve disputes through binding arbitration.  *Id.*  Judge Altman  confirmed that the Nexgen Terms and Conditions were a 'browsewrap agreement' which were "buried in a hyperlink at the bottom of its website."  *Id.* at * 5-6.  The Court then acknowledged the "conspicuous" test to enforce browsewrap agreements.  *Id.* at * 7. ("[U]nder both Florida and California law . . . whether a reasonably prudent user is put on inquiry notice turns on the *clarity* and *conspicuousness* of the terms.") (cleaned up, emphasis in original).  The Court defined "conspicuous" as "obvious to the eye or mind," "easily noticed," or "plainly visible." *Id.* at * 7 (citing Conspicuous, Merriam-Webster  Unabridged,  https://unabridged.merriamwebster.com/unabridged/conspicuous)  and found that "Nexgen's display of its Terms of Use on its home page is pretty much the *opposite* of conspicuous."  *Id.* (emphasis in original).  The Court then rejected Defendant's argument that the Terms and Conditions were conspicuous, distinguishing *Berman* and explaining: "we disagree

with this—principally because the Terms of Use were presented in small, colorless text and buried inconspicuously at the very bottom of a long and busy page (which itself was full of bright words, colorful action buttons, and vivid images)." *Id.* at * 8. The Court emphasizes the lack of conspicuousness and consistency with the ruling in *Berman*:

> Our case is even more straightforward. Unlike the websites in *Berman*, after all, the words "arbitrate" or "arbitration" never appear on the two pages Valiente visited. Instead, Valiente would have had to (first) find the Terms of Use, then intuit that the Terms of Use included some information that mattered to him, and finally click on the Terms of Use and read them carefully before he would ever have been presented with an arbitration clause like the one the Ninth Circuit found *insufficient* in *Berman*. That (salient) difference aside, *Berman* is on all-fours with our case.
>
> [...]
>
> As this recitation should make plain, *none* of the text in this carefully interred section of the website is underscored, *none* of it appears in all-capital letters, and *none* of it is displayed in contrasting fonts or colors in a way that would distinguish it from any non-hyperlinked material. There is, in other words, no meaningful way for users to discern what's a hyperlink and what's not without "hover[ing] their mouse over otherwise plain-looking text or aimlessly click[ing] on words on a page in an effort to ferret out hyperlinks." *Ibid.* (cleaned up). As in *Berman*, then, Nexgen's failure to "clearly denote the hyperlinks here fails [the] conspicuousness test."

*Id.* at * 9-10 (emphasis in original).  The Court concluded this inquiry by soundly Defendant's browsewrap theory.  *Id.* at 10.

In conclusion on arbitration: prior to filing suit, Jonny never had actual knowledge of the Policy; and, the "Our Policy" text on Dough Finance's website (assuming same existed in mid-2024), which is in black and white (not clearly hyperlinked), located on the bottom of the website, without any description that it seeks to incorporate a collateral Policy, and that the Policy contains a mandatory arbitration provision, was insufficiently conspicuous to put Jonny on inquiry notice. The Policy is therefore unenforceable and the *Motion to Compel Arbitration* should be denied.

## II.     THE VERIFIED COMPLAINT IS SUFFICIENTLY PLED AND THE MOTION TO DISMISS SHOULD BE DENIED.

### A.     Jonny's Claims Meet the Heightened Rule 9(b) Pleading Standard

#### 1.     Federal Pleading Standard

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  As a general rule, when reviewing a motion to dismiss, a court must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). This is true even if "it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

#### 2.     Rule 9(b) Heightened Pleading Standard

Federal Rule of Civil Procedure 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) dictates that the complaint must allege:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Grp.*, 658 F.3d, 1282, 1296 (11th Cir. 2011).  "The purpose of Rule 9(b) is to "alert[ ] defendants to the precise misconduct with which they are charged and protect[ ] defendants against spurious charges...." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d

1217, 1222 (11th Cir. 2012) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (cleaned up).  The Verified Complaint does just that.

> **3.    The Verified Complaint Identifies With Precision Chase's Misstatements and Omissions, Which Were Made Prior to Jonny's Invesment in Order to Induce The Investment in Dough Finance**

First and foremost: each of Plaintiff's causes of action is sufficiently pled to meet the general Rule 12(b)(6) standard.  *See generally*, Compl., ¶¶ 68 – 82 (pleading the elements of Negligent Misrepresentation); *id.* at ¶¶ 79 – 85 (Breach of Fiduciary Duty); *id.* at ¶¶  86 – 93 (Fraud); *id.* at ¶¶ 94 – 115 (FSIPA).  Therefore, the only question for the Court is whether the Verified Complaint sufficiently pleads the particularity requirement of Rule 9(b).

"The particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Medco Health Sols., Inc.*, 671 F.3d 1217 at 1222 (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir.2009)); *see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir.2002)*; Ziemba*, 256 F.3d at 1202 (noting the pleading standards are satisfied if alleging precisely what statements were made in what documents, when, where and by whom, the content, the manner in which they misled the plaintiff, and what the defendants obtained as a consequence of the fraud).

As alleged the Verified Complaint: in and around April and May of 2024 (i.e., **time**), Chase Herro (i.e., **who**) sent Jonny Lopez actual communications—written text messages, iMessages, together with audio recordings sent via iMessage and FaceTime video conferencing (i.e., **where/place**) that (i) Dough Finance had millions of dollars worth of ETH in reserves and millions in *available liquidity*; (ii) that any cryptocurrency transacted on *Dough Finance*  was *100% secure*;

and (iii) Jonny's investment was *akin to an escrow* and available to him at any time (i.e., **substance**).  *See* Compl., ¶¶ 29-34, 40-42, 51-53.  To reinforce the specificity of the allegations for which Chase committed these misrepresentations, Jonny encloses copies of the actual text messages received from Chase around that time.  *See* Resp. Exs. A – F.   What did Defendant obtain as a result?  Jonny's millions of dollars of ***actual liquidity*** on the *Dough Finance* platform (unlike the non-existent liquidity that Chase mirepresented).

The Motion grossly misrepresents the sufficiency of the allegations, improperly suggesting that "Plaintiff fails to identify the specific statements Hero allegedly made" (Mot. at 13), even though the Verified Complaint ***repeatedly quotes*** verbatim several of Chase's specific statements to Jonny.  *See* Compl., ¶¶ 30, 31, 33, 34, 35, 41, 42, 49, 52, 53.

Contrary to what the Motion suggests, "liquidity" is not a vague or esoteric concept. "Liquidity refers to how easily or quickly a security can be bought or sold in a secondary market without significantly impacting its trading price."[3]  Here, where Chase misrepresented having hundreds of millions of dollars in cash backing *Dough Finance,* he led Jonny to believe that the platform (and Jonny's investment) was absolutely liquid.  The U.S. Securities and Exchange Commission has pursued brokers and other private parties for misrepresenting investment liquidity risk.  *See, e.g., S.E.C. v. Morban Keegan & Co., Inc.*, 678 F.3d 1233, 1249 (11th Cir. 2012) ("In this case, the SEC presented evidence that four Morgan Keegan brokers misrepresented the liquidity risk of ARS to customers"); *S.E.C. v. Kinetic Inv. Grp., LLC*, 20-cv-394-MSS-SPF, 2024 WL 4869623 at * 5 (M.D. Fla. Nov. 22, 2024) ("Liquidity: Fifth, Williams claimed that FKYield assets had liquidity[.]. However, KFYield's investment in Lendacy, which consiseted of unsecured

---

[3] U.S. Securities and Exchange Commission Glossary, accessible at https://www.sec.gov/resources-small-businesses/cutting-through-jargon-z#:~:text=Liquidity%20refers%20to%20how%20easily,significantly%20impacting%20its%20trading%20price. (last accessed March 10, 2025).

loans primarily for the benefit of Williams, significantly limited Kinetic Funds' ability to honor redemption requests to all investors equitably."); *id* at * 46 (granting summary judgment and specifically finding that "Williams knowingly misrepresented to investors that the KFYield asssets had liquidity"). Somewhat relatedly, the U.S. Securities and Exchange Commission has repeatedly sought to enforce 'crypto-schemes' like *Dough Finance*. *See e.g.:*

- *Bittrex* https://www.sec.gov/newsroom/press-releases/2023-78;

- *Crypto, Inc.* https://www.sec.gov/newsroom/press-releases/2024-16;

- *Rari Capital, Inc.,* https://www.sec.gov/newsroom/press-releases/2024-138;

- *CoinW6* https://www.sec.gov/newsroom/press-releases/2024-134.

Indeed, this Court (Hon. Jacqueline Becerra) recently sentenced the operator of crypto platform CluCoin to 27 months for wire fraud.[4] The Court should find that the Verified Complaint pleads with sufficient particularity to meet the heightened Rule 9(b) standard, and dismissal on that basis should be denied.

**B.     The Verified Complaint Actually and Sufficiently Alleges Both Causation and Reliance**

It is undisputed that the Verified Complaint pleads both causation and justifiable reliance. *See* Compl., ¶¶ 78, 83, 84, 85, 91, 93 (allegations of causation); *id.* at ¶¶ 78, 84, 91 (allegations of reliance). To be sure: the gravamen of Plaintiff's allegations is that Chase promised Jonny absolute security of his investment. "***You have liquidity at any time, anywhere, always, because its connected to the chain like their escrow***." Compl., ¶ 31. Market fluctuations aside, Chase misrepresented to Jonny that *Dough Finance* had sufficient liquidity such that a "flash loan" attack

---

[4] *Founder of Miami-Based Cryptocurrency Token CluCoin Sentenced for Wire Fraud*, U.S. Attorney's Office, Southern District of Florida https://www.justice.gov/usao-sdfl/pr/founder-miami-based-cryptocurrency-token-clucoin-sentenced-wire-fraud (accessed March 10, 2025).

could never affect Jonny's initial position.  *Id.*  It is precisely because Chase's misrepresentations relate to the same reason that Jonny lost his investment; and because ***but for*** Chase's misrepresentation, Jonny would not have invested, *see* Compl., ¶ 92, that the Verified Complaint sufficiently pleads loss caustion.  *See Bruschi v. Brown*, 876 F.2d 1526, 1530-31 (11th Cir. 1989) (finding loss causation where misrepresentations about a stock's safety were followed by a drop in stock price because the stock was in fact risky).

The Motion argues that Jonny was a sophisticated entrepreneur who must have known that crypto platforms are insecure; and therefore, Chase should be immune from his fraudulent misrepresentations.  *See generally,* Mot. at § IV.D.  All arguments related to Jonny's lack of justifiable reliance depend on the Court's  enforcement of the Policy which, as explained *supra*, is unenforceable.  *See* Resp. at § I.  Furthermore, the Motion inappropriately relies on *Butler v. Yusem.*  As the Florida Supreme Court made clear, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation."  *Byrnes v. Small*, 142 F. Supp. 3d 1262, 1270 (M.D. Fla. 2015) (quoting *Butler v. Yusem*, 44 So.3d at 105).  Therefore, the Court should disregard Defendant's justifiable reliance argument *in toto*.  Nevertheless, Jonny did not know the falsity of Chase's misrepresentations, and could only have reasonably expected that his million dollar investment would be "100% secure" when it was backed by Chase's representation of ***hundreds of millions of dollars of liquidity***.  *See* Compl., ¶ 34,  *See* Resp. Ex. C.   Because Jonny did not know that Chase's representations about *Dough Finance* were false, his reliance on Chase's screen shots purporting to show millions of dollars of cash on hand, and his consequential reliance on Chase's representation that Jonny's investment was like an "escrow" was necessarily justified.  *See Dantzler, Inc. v. PNC Bank, Nat. Ass'n*, 946 F. Supp 2d. 1344, 1364 (S.D. Fla. 2013); *c.f. Megaval Enterprises, Ltd. v. Bank of America, N.A.*, 14-20909-CIV-WILLIAMS, 2014 WL 12609318, at *

7 (S.D. Fla. Oct. 8, 2014) (finding no justifiable reliance where the recipient knew of the falsity of the statements).

### C.     Chase's High-Risk and Unorthodox "Looping" Tool Is Precisely the Sort of Extraordinary Circumstance That Creates a Fiduciary Relationship

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (quoting Restatement (Second) of Torts, § 874 cmt. A). "The relation and duties involved need not be legal; they may be moral, social, domestic or personal." *Id.* (quoting *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 421 (1927). A fiduciary relationship may be implied by law, and such relationships are "premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Id.* (quoting *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla. 3d DCA 1994)).   "[T]he liability [for breach of fiduciary duty] is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation."   *Id.* (quoting Restatement (Second) of Torts, § 874 cmt b.

The facts and circumstances here demonstrate that Jonny specifically and intentionally requested advice from Chase (specifically on the ins-and-outs of "looping"), and that Chase's conversations with Jonny demonstrate that he accepted the trust that Jonny placed in him.  So much so, that he repeatedly reassured him that what he was doing was proper.  Jonny, although he was experienced in trading Etherium, had ***no prior*** dealings or experience with Chase Herro, and no knowledge of how *Dough Finance* operated.  The trust and confidence that Jonny placed in Chase to explain how *Dough Finance* "high-risk 'looping' feature" (*see* Mot. at 1) worked is evidenced by by myriad text messages, iMessages, FaceTime video calls, and audio messages that Jonny and Chase traded, ***specifically so that Chase could assure Jonny how to property loop***.  *See* Compl.

¶¶ 40-41. The Court should find that these circumstances satisfy the "trust and confidence" standard and that a fiduciary relationship existed.

    **D.**    **Jonny's Investment on Dough Was a Security.**

The Verified Complaint generally alleges that Plaintiff's investment and other financial activity on *Dough Finance* amounted to a purchase of a security interest within the definition of Fla. Stat. § 517.021 (FSIPA).   Compl., ¶ 96.   Count IV (FSIPA) goes on to describe how *Dough Finance* "pools" investor funds together and paid investors back returns such that "each pool investors fortunes were tied to the fortunes of other investors."   Compl. ¶¶ 100-105.   Plaintiff maintains that Jonny's investment of money on *Dough Finance*, coupled with Chase's promises of 2x returns, guaranteed profits, and the allure of making a "shit ton" of money and that Jonny's investment would be "very lucrative," made Jonny's deployment of capital an "investment contract" sufficient to satisfy the *Howey* Test. *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946) (an "investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.").

Under *Howey*, "An offering is an investment contract if there is: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others. *Id.*   First, it is undisputed that Jonny invested millions of dollars onto *Dough Finance*.   Compl. ¶¶ 29, 50; *see also SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999) (the investment of money required for an "investment contract" does not need to be cash, but is sufficient if it is "an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses.").   "[A] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and

success of those seeking the investment of third parties.'" *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999). Plaintiff alleges sufficient facts to meet this standard. Compl. ¶¶ 100-105. Specifically, the "looping" feature of *Dough Finance* would ostensibly double the amount of Etherium that Jonny was able to invest *automatically*, and based on the proprietary code and liquidity of the platform itself – thereby leading Jonny to believe that the success of his investment on *Dough Finance* was coupled with the success and viability of the platform as a whole. *See e.g., Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (noting horizontal commonality exists where the fortunes of each investor are tied "to the success of the overall venture")). When Chase specifically represented to Jonny that he was expected to make certain returns, and that it was specifically because Chase had built the platform ("***What you think I built some stupid toy lol***, Compl., ¶ 35), Jonny was led to believe that Chase's efforts to promote *Dough Finance* would lead to guaranteed success. *ATBCOIN*, 380 F. Supp. 3d at 354 (finding speculative interest enough when purchasers believe based on defendant representations that those defendants will commercialize the relevant crypto blockchain and crypto coins there).

In sum: the Court should find that the "pooled investment" of money onto *Dough Finance*, promoted by Chase through his efforts, and the promise of guaranteed profits, amounted to an "investment contract" and, pertinent here, a security sufficient for a claim arising under FSIPA.

## Conclusion

For all the foregoing reasons and authorities, the Court should find that the *Verified Complaint* [ECF No. 1] is sufficiently pled and meets the heightened pleading standard of Rule 9(b). The Court should therefore deny the Motion to dismiss on that basis and require Defendants to answer the Complaint, together with such additional releief the Court deems just and proper.

Dated: March 10, 2025

Respectfully submitted,

**PARDO LAW PLLC**
1205 Lincoln Road, Suite 211
Miami Beach, Florida 33139
Telephone: (305) 308-7388
Email: joe@pardolawmiami.com

By: */s/ Joseph I. Pardo, Esq.*
      Joseph I. Pardo, Esquire
      Florida Bar No. 1003339

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 10th day of March, 2025, a copy of the foregoing

was filed electronically by using the CM/ECF system, and that notification of this filing is to be

provided to all counsel of record who have registered to receive notices from the court under the

CM/ECF system.

By: */s/ Joseph I. Pardo,*

## **<u>VERIFICATION</u>**

Under penalty of perjury, I declare that I have read the foregoing *Verified Response* and the

facts contained therein are true, correct, and based on my personal knowledge.

By: _____
Name: Jonathan Lopez