IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:25-cv-20405-JB

JONATHAN LOPEZ.

       Plaintiff,

v.

CHASE HERO,

       Defendant.

**REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE MOTION TO DISMISS**

I.  **INTRODUCTION**

The Court should compel arbitration or, alternatively, dismiss this case with prejudice. Lopez's Opposition (D.E. 14) falls flat. He argues that the "OUR POLICY" hyperlink was too inconspicuous to bind him to Dough's Terms of Use and arbitration clause, but the record proves otherwise. The hyperlink's prominent placement on Dough's sole operational page, Lopez's own screenshots confirming he saw it, and his sophisticated, months-long use of the Dough platform all warrant enforcement. Alternatively, dismissal with prejudice is warranted under Fed. R. Civ. P. 12(b)(6). Lopez's claims collapse under Rules 9(b) and 12(b)(6) due to vague fraud allegations, a third-party hack that severs causation, and a decentralized DeFi structure that does not qualify as a security under FSIPA. Accordingly, the Court should compel arbitration and stay this case. If not, it should dismiss the case with prejudice.

II.  **THE COURT SHOULD COMPEL ARBITRATION.**

A.  **Lopez Had Notice of the Terms of Use.**

Plaintiff's primary contention—that the "OUR POLICY" hyperlink was too "inconspicuous" to put him on notice of Dough's Terms of Use—collapses under scrutiny. Opp. at 7-13. Florida courts enforce browsewrap terms of use where a user has actual notice of the terms or the terms are conspicuous enough to provide inquiry notice. *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028-29 (Fla. 3d DCA 2018). Here, Lopez had both.[1]

---

[1] Lopez continues to baselessly suggest, without any evidence, that the Policy attached to Defendant's Motion to Compel Arbitration, ECF No. 10-1 at Ex. A, may not be the same policy in effect in "mid-2024" when he used Dough. *See* D.E. 14 at 9 n.2 & 13. However, the unrebutted evidence confirms that the Policy has remained unchanged and is identical to the one in place when Lopez transacted on Dough. D.E. 10-1, Zuljevic Decl. ¶¶ 18-19. The date "January 16, 2025" appears on the Terms of Use solely because it reflects the date undersigned counsel printed the Policy from the Dough website.

1

*Actual Notice*

The undisputed evidence confirms that Lopez saw the "OUR POLICY" hyperlink. Multiple text chains attached to his Opposition confirm Lopez saw the "OUR POLICY" button. *See* D.E. 14-2 at 2, 7 (texts from Lopez with screenshots of the Operational Page prominently displaying the "OUR POLICY" button); D.E. 14-5 (same); D.E. 14-6 (same). This fact—absent from every "browsewrap" case Plaintiff relies on—establishes actual notice.

In *MetroPCS*, the court enforced a browsewrap agreement (and the arbitration provision inside it) where the plaintiff admitted seeing a hyperlink to the terms but chose not to click it, reasoning: "A person has no right to shut his eyes or ears to avoid information, and then say that he has no notice." *MetroPCS*, 273 So.3d at 1029 (quoting *Sapp v. Warner*, 141 So. 124, 127 (Fla. 1932)). Lopez's texts present an identical scenario: they indicate he knew the hyperlink existed, likely understood it linked to Dough's terms and policies, and deliberately chose not to investigate. That decision to bury his head in the sand does not negate notice—it binds him to the terms. *Id.*; *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1189 (S.D. Fla. 2021), *aff'd*, No. 21-11567, 2022 WL 1499693 (11th Cir. May 12, 2022) (enforcing terms even where the plaintiff chose not to "read the terms" because the hyperlink was positioned next to an action button the plaintiff clicked).

*Inquiry Notice*

Even without actual notice, the prominence of the "OUR POLICY" hyperlink satisfies inquiry notice. Plaintiff concedes the hyperlink appeared in all caps on the uncluttered Operational Page, visible without scrolling during any action Lopez undertook on the website—including supplying, borrowing, repaying, swapping, withdrawing, or looping assets. D.E. No. 14 at 7; D.E.

10-1, Zuljevic Decl. ¶¶ 4-11. It was equally prominent on the Tutorials and Docs pages that Lopez admits visiting. D.E. 1, Compl. ¶¶ 43-47; D.E. 10-1, Zuljevic Decl. ¶¶ 10-16.

Moreover, and unlike the consumer cases Lopez relies on, Lopez repeatedly texted Hero with screenshots where the "OUR POLICY" button is clearly visible, demonstrating that he saw the "OUR POLICY" button multiple times. *See* p. 2 above. This is not a buried footer link; it is a conspicuous, repeatedly presented notice in a sparse interface, placed directly in the user's line of sight throughout his interactions with the Dough platform.

Courts routinely enforce browsewrap agreements with similar visibility, positioning near action buttons, and general language such as "View Terms." *See Derriman v. Mizzen and Main LLC*, 710 F. Supp. 3d 1129, 1140 (M.D. Fla. 2023) (enforcing arbitration agreement where user clicked a button to sign up for emails and texts, located next to a hyperlinked statement reading "View Terms"); *Kravets v. Anthropologie, Inc.*, 2022 WL 1978712, at *4 (S.D. Fla. June 6, 2022) (same); *Arencibia*, 533 F. Supp. 3d at 1190 (enforcing browsewrap where plaintiff had to select trip insurance, with a terms hyperlink directly below the selection button).

Plaintiff argues the agreement should not be enforced because the "OUR POLICY" button does not expressly mention arbitration. Opp. at 8. But Florida law imposes no such requirement. A hyperlink to terms and conditions need not explicitly reference arbitration for the provision to be enforceable. *See MetroPCS*, 273 So. 3d at 1028-29 (enforcing terms labeled simply as "Terms & Conditions"); *Derriman*, 710 F. Supp. 3d at 1140 (enforcing arbitration provision in hyperlinked terms where the button merely stated "View Terms & Privacy"); *Kravets*, 2022 WL 1978712, at *4 (same).

In short, the "OUR POLICY" hyperlink was sufficiently conspicuous to put a reasonably prudent person on inquiry notice. *Id.* The arbitration provision within the "OUR POLICY" page should thus be enforced.

### B. Context and Sophistication Bolster a Finding of Notice.

The nature of the transaction—a $1 million DeFi transaction—further reinforces that Lopez was on notice. Courts routinely enforce browsewrap agreements in "continuing relationship" contexts where users should reasonably expect governing terms. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024). Lopez deposited ETH in May 2024 and actively looped assets for two months. D.E. 1, Compl. ¶¶ 50-54. This was not a one-time purchase but an extended, ongoing engagement. As a self-described "entrepreneur" (Compl. ¶ 11), Lopez was not a casual consumer making a small, one-time transaction—he was a sophisticated, frequent user who placed $1 million to the platform. "The context of this transaction" undeniably "reflected the contemplation of some sort of continuing relationship that would have put [Lopez] on notice for a link to the terms of that continuing relationship." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). In this context, the "OUR POLICY" hyperlink logically signaled binding terms governing his relationship with Dough and its employees. Once again, Lopez's failure to click the link does not negate notice—it was his burden to investigate. *Arencibia*, 533 F. Supp. 3d at 1189 ("[E]ven if Plaintiff did not read the terms … he was on inquiry notice.").

### C. Plaintiff's Cited Cases Are Inapposite.

Lopez primarily relies on four cases—*Fridman v. 1-800 Contacts, Inc.*, *Valiente v. NexGen Global, LLC*, *Goldstein v. Fandango Media, LLC*, and *Bell v. Royal Seas Cruises, Inc.*—to argue that Dough's Terms of Use is an unenforceable browsewrap agreement. But these cases, involving low-cost, one-time consumer purchases, are nothing like Lopez's $1 million cryptocurrency

4

transaction, which required sustained engagement. Moreover, unlike in those cases, Dough's "OUR POLICY" hyperlink was clearly visible.

The purchases in *1-800 Contacts*, *NexGen*, and *Fandango*—contact lenses, spray bottles, and movie tickets—were one-time transactions. By contrast, Lopez actively managed a $1 million Ethereum deposit through Dough's looping feature for months. Courts recognize that sustained platform use "reflect[s] the contemplation of some sort of continuing relationship" that puts users on notice of governing terms. *Keebaugh*, 100 F.4th at 1019. Lopez's repeated use of Dough's platform makes his situation wholly different from the one-time purchases in his cited cases.

Lopez's cases also involve hidden or buried terms: *1-800 Contacts* found a footer link "not prominent," (554 F.Supp.3d at 1261-62), *NexGen* had a buried hyperlink (2023 WL 6213583, at *6), and *Fandango* (2021 WL 6617447, at *3) required zooming to read. By contrast, Dough's "OUR POLICY" was one of only two all-caps elements on a minimalist page, visible without scrolling during every type of transaction Lopez could undertake on the site. D.E. 10-1, Zuljevic Decl. ¶¶ 6-11. And further, unlike in Lopez's cited cases, there is no doubt here that Lopez repeatedly saw the hyperlink, establishing inquiry notice. D.E. 14-2, 14-5 14-6 (Lopez's texts showing he saw the hyperlink because he took screenshots of the Operational Page).

Lopez's reliance on *Bell* backfires. That case enforced a browsewrap agreement because the hyperlink was near an action button—just like Dough's, which was persistently visible near the borrowing, looping, and swapping transaction buttons. 2020 WL 5742189, at *7.

In short, unlike in *1-800 Contacts*, *NexGen*, and *Fandango*, Lopez's transaction was not a minor, one-time purchase, and Dough's hyperlink was not buried. This case aligns with *Derriman, Arencibia*, and *Kravets*, where browsewrap agreements were enforced due to their proximity to action buttons, and with *Keebaugh* and *Oberstein*, which recognize that an ongoing relationship

5

puts users on notice. The Court should thus enforce the arbitration agreement in the Terms of Use and stay this case pending the outcome of the arbitration. *Emergency Recovery Inc. v. Conifer Revenue Cycle Sols., LLC*, 2025 WL 71974, at *8 (S.D. Fla. Jan. 10, 2025).

### III.  IN THE ALTERNATIVE, THE COURT SHOULD GRANT DEFENDANT'S MOTION TO DISMISS WITH PREJUDICE.

#### A.  Lopez's Claims Fail Rule 9(b)'s Heightened Pleading Standard.

Lopez argues that his Complaint meets Rule 9(b)'s particularity standard by citing a flood of communications—texts, audio recordings, and FaceTime calls—purportedly from the Defendant. Opp. at 2-3. He block-quotes two long audio transcripts and references exhibits expecting the Court to hunt for misstatements without identifying which specific statements are false. *Id.*; D.E. 14-1 to 14-6.

This approach fails. Lopez does not specify *which* statements are false, *how* they are false, or *when* they became false. Instead, he gestures at a mass of communications, hoping the Court will piece it together. That does not satisfy Rule 9(b). In fact, the cited recordings show Hero advising caution: "keep it simple," "be very careful," and "talk to your accountant." Opp. at 2-3. Hero warns Lopez about liquidity risks ("you only have roughly fifty percent of liquidity, minus liquidation threshold") and transaction fees ("you're gonna lose fees…"). In short, Rule 9(b) requires more than conclusory allegations and pointing to a mass of communications; Lopez must point to specific statements and explain *why* they are false. *See W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) ("Exhibits D–G consist of three emails and one fax that, plaintiff avers, are further 'examples' of defendants' fraudulent representations … However, the complaint neither explains the circumstances of that project nor plead facts suggesting that Exhibit D was in any way false.").

6

At most, Lopez contends Hero made false statements about two categories: "liquidity" and "security." Opp. at 15-16. On liquidity, Lopez alleges Hero misrepresented having "hundreds of millions of dollars in cash backing Dough Finance" (Opp. at 16), but his Complaint offers only speculation—"upon information and belief, none of the liquidity … actually existed" D.E. 1, Compl. ¶ 58. That's insufficient. *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 2016 WL 4254257, at *4 (S.D. Fla. Feb. 16, 2016) (Rule 9(b) requires concrete facts, not "upon information and belief" speculation). Lopez alleges no facts showing these "liquidity" statements were false when made.

On security, Lopez claims that Hero made a supposed promise that Dough was "100% secure," and he interprets that as a promise that the platform was absolutely immune from hacking. Opp. at 15-16. But Lopez never identifies when Hero made this supposed "100% secure" statement, in what medium, or in what context. The quoted texts and audio do not contain such a promise nor do they contain the "100% secure" statement. *See* Opp. at 2-3; D.E. 14-1 to 14-6. The audio transcript instead reflects Hero saying: "You have liquidity at any time, anywhere, always, because it's connected to the chain like their escrow. The money is locked on the chain where only you can get it out." D.E. 1, Compl. ¶ 31; Opp. at 2-3. That's a technical statement about blockchain, not an absolute guarantee against hacking. Claims premised on fraud require the " time, place, and manner" of the alleged misrepresentation. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997). Without that specificity, Rule 9(b) bars Lopez's claims based on the supposed "100% secure" statement.

    **B.**  **Lopez Fails to Plead Proximate Causation.**

Proximate cause requires a direct connection between the misrepresentation and the harm. *Tardif v. People for Ethical Treatment of Animals*, 829 F. Supp. 2d 1219, 1232 (M.D. Fla. 2011). An intervening criminal act—such as a hack—disrupts that causal chain. *Dep't of Transp. v.*

7

*Anglin*, 502 So. 2d 896, 898 (Fla. 1987). Lopez concedes that Hero had no involvement in the hack and does not allege that Dough was particularly susceptible to such attacks. D.E. 1, Compl. ¶¶ 54-57. In other words, Lopez admits the hack exploited market mechanics, not Dough's design, leaving Hero's statements irrelevant. Because the "flash loan attack" was the proximate cause of Lopez's alleged damages, he cannot establish a claim for fraud, negligent misrepresentation, or breach of fiduciary duty against Hero. *Tardif*, 829 F. Supp. 2d at 1232; *Stahl v. Metro. Dade Cnty.*, 438 So. 2d 14, 21 (Fla. 3d DCA 1983) ("[W]hen reasonable people cannot differ [on proximate cause], the issue has been said to be one of law for the court."). Accordingly, those claims must be dismissed.

### C. Lopez Fails to Plead Justifiable Reliance for His Negligent Misrepresentation Claim.[2]

Plaintiff has not plausibly alleged that he reasonably relied on Hero's purported statements about Dough's security, warranting dismissal of his negligent misrepresentation claim. *See Trinidad & Tobago Unit Tr. Corp. v. CB Richard Ellis, Inc.*, 280 F.R.D. 676, 679 (S.D. Fla. 2012) (dismissing misrepresentation claim for failure to allege reasonable reliance).

Lopez claims Hero stated that the Dough platform was "100% secure," but he had no reasonable basis to interpret that as a guarantee of absolute immunity from hackers. The Terms of Use explicitly warn of potential security risks. *See* D.E. 10-1, Ex. A at 12-14 ("Each User acknowledges and agrees that such technologies are novel, experimental, and speculative, and that therefore there is significant uncertainty regarding the operation and effects and risks thereof … Advances in codecracking or technical advances such as the development of quantum computers

---

[2] Lopez appears to be correct that under Florida law "justifiable" reliance is not an element for a fraud claim but is an element for a negligent misrepresentation claim. Lopez fails to plausibly state a fraud claim based on the two arguments above in the Rule 9(b) and Causation sections.

may present risks to Blockchain Systems, Host Markets, Dough Protocols, Blockchain Tokens, or Traded Assets, including the theft, loss or inaccessibility thereof."). Courts routinely reject fraud claims based on alleged oral misrepresentations that are contradicted by written agreements. *See Creative Am. Educ., LLC v. Learning Experience Sys., LLC*, No. 9:14-CV-80900, 2015 WL 2218847, at *4 (S.D. Fla. May 11, 2015) ("[A] party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written [agreement.]").

Further, hacking risks in the DeFi space are well known, and as a sophisticated entrepreneur, Lopez could not have reasonably believed that anything Hero said about Dough's security amounted to an absolute guarantee against such hacking risks. *Trinidad & Tobago Unit Tr. Corp.*, 280 F.R.D. at 679 (collecting cases showing sophisticated parties cannot rely on any representations they know to be erroneous). Because Lopez has failed to plead justifiable reliance, his negligent misrepresentation claim must be dismissed.

### D. No Fiduciary Duty Exists.

Lopez claims that chats with Hero about "looping" created a fiduciary duty because he sought Hero's advice and Hero "accepted his trust." Opp. at 19. But the allegations in the Complaint allege nothing more than crypto commerce, not a fiduciary pact. A fiduciary duty requires "dependency" and an "undertaking … to advise, counsel, and protect" beyond an arm's-length deal. *McLean v. GMAC Mortg. Corp.*, 2008 WL 1956285, at *18 (S.D. Fla. May 2, 2008). Lopez's allegations amount to nothing more than a transactional discussion—Hero explained Dough's features, nothing more. Lopez alleges no special vulnerability or reliance exceeding a typical crypto user. His cited texts show Hero giving platform tips, not pledging to safeguard his wealth. D.E. 1, Compl. ¶¶ 40-41, 80. Conclusory trust assertions do not create a fiduciary duty. *Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009). Hero

offered tips, not a trustee's oath, and this claim should be dismissed.

### E. Lopez's FSIPA Claim Fails—There's No Security.

Lopez argues that his Dough "financial activity" qualifies as a "security" under FSIPA, citing "pooled" funds and Hero's alleged "guaranteed profits." Opp. at 20-21. But Dough's DeFi pools do not meet the latter two elements of the *Howey* test, which requires (1) an investment, (2) a common enterprise, and (3) profits "solely from the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Lopez concedes that Dough's looping function operates through smart contracts—self-executing code running on a blockchain. D.E. 1, Compl. ¶¶ 16, 100. Yet he fails to allege that Dough or Hero controlled these smart contracts or dictated their operations. Instead, liquidity providers like Lopez deposit assets into algorithmic pools that autonomously generate fees based on market activity—not the efforts of a centralized promoter. Indeed, Lopez admits his expected returns "arose from the activities of the pools, which were facilitated by smart contracts." D.E. 1, Compl. ¶ 103. Thus, *Howey's* latter two elements are not met.

A recent Second Circuit decision, *Risley v. Universal Navigation, Inc.*, 2025 WL 615185 (2d Cir. Feb. 26, 2025), reinforces this conclusion. That case held that developers of automated smart contracts on a decentralized exchange are not liable under federal securities laws for third-party fraud. *Id.* at *4. The court found that smart contracts function more like user agreements than traditional securities transactions and that the smart contract drafters and developers cannot be held liable as broker-dealers. *Id.* That reasoning applies here.

At all times, Lopez retained custody and control of his assets while using autonomous blockchain software. This is the opposite of a traditional security, where investors passively rely on a promoter's expertise. Because Lopez's profits stemmed from his own strategic choices about looping—not the "undeniably significant" efforts of a managerial entity—FSIPA does not apply. *See S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999).

10

Dated: March 21, 2025                                          Respectfully submitted,

                                                               **MARCUS NEIMAN**
                                                               **RASHBAUM & PINEIRO LLP**

                                                               By: /s/ Brandon S. Floch
                                                               Jeffrey A. Neiman
                                                               Florida Bar No. 544469
                                                               jneiman@mnrlawfirm.com
                                                               Brandon Floch
                                                               Florida Bar No. 125218
                                                               bfloch@mnrlawfirm.com
                                                               One Biscayne Tower
                                                               2 S. Biscayne Blvd., Ste. 2530
                                                               Miami, Florida 33131
                                                               Phone: (305) 400-4260

                                                               *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on March 21, 2025 a copy of the foregoing was filed on the Court's e-filing system and delivered to all parties of record.

*/s/ Brandon S. Floch*
*Brandon S. Floch*