UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-CV-20405-JB


JONATHAN LOPEZ,                                Miami, Florida

                Plaintiff,                     October 9, 2025

      vs.                                      8:40 a.m. - 9:28 a.m.

CHASE HERRO, a/k/a CHASE HERO,                 Volume 1 of 1

                Defendant.                     Pages 1 to 36
_____

                        MOTION HEARING
          BEFORE THE HONORABLE JACQUELINE BECERRA
                UNITED STATES DISTRICT JUDGE

APPEARANCES:


FOR THE PLAINTIFF:              JOSEPH ISAIAH PARDO, ESQ
                                Pardo Law PLLC
                                1205 Lincoln Road
                                Suite 211
                                Miami Beach, Florida 33139

                                DEREK GRANT SILVER, ESQ
                                Edelboim Lieberman and Revah
                                PLLC
                                20200 West Dixie Highway
                                Suite 905
                                Miami, Florida 33180

FOR THE DEFENDANT:          BRANDON SCOTT FLOCH, ESQ
                           JEFFREY ADAM NEIMAN, ESQ
                           BRYAN ALMEIDA, ESQ
                           Neiman Mays Floch & Almeida
                           PLLC
                           100 Southeast 3rd Avenue
                           Suite 805
                           Fort Lauderdale, Florida 33394

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

(Call to order of the Court at 8:40 a.m.)

THE COURTROOM DEPUTY:  Case No. 25-CV-20405-Becerra, Lopez vs. Herro.

Counsel, please state your appearances for the record, starting with the plaintiff.

MR. PARDO:  Good morning, Your Honor.  Pardo Law PLLC, Joseph Pardo and Derek Silver for the plaintiff, Jonathan Lopez.

MR. FLOCH:  Good morning, Your Honor.  Brandon Floch for the defendant Chase Herro, from Neiman Mays Floch & Almeida PLLC. With me is Jeffrey Neiman and Bryan Almeida.

THE COURT:  All right.

MR. NEIMAN:  Good morning, Your Honor.

THE COURT:  Good morning.  You may all be seated.

We're here today on the motion to compel arbitration or alternative the motion to dismiss counsel, please proceed.

MR. FLOCH:  Thank you, Your Honor.  May I use the podium up here?

THE COURT:  Sure.

MR. FLOCH:  Good morning, Your Honor.  May it please the Court.

As you stated, we're here on a motion to compel arbitration, or alternatively a motion to dismiss.  Defendant Chase Hero ask this Court to compel arbitration.  We believe there is only one question in dispute today, and that question is --

THE COURT:  You need to slow down or there is going to be

no question.

MR. FLOCH:  My apologies.

THE COURT:  The court reporter won't be able to transcribe, so please slow down.

MR. FLOCH:  Did Mr. Lopez have a reasonably conspicuous notice of the terms that governed use on the Dough Finance platform and then did he continue to use the platform, and we submit he did.

THE COURT:  Why does the continued use of the platform go to the notice issue of another browsewrap?

MR. FLOCH:  Your Honor, turning to the law, there are two issues that we need to look at today under Florida law; notice and then assent.  They're two separate issues.

THE COURT:  I know.  But if you don't have notice, its continued use doesn't give you assent.

MR. FLOCH:  Yes, Your Honor.  We believe we have both here.

THE COURT:  Right.  But work with me here.

If you don't have notice --

If the browsewrap didn't give him the notice required under Eleventh Circuit precedent, his continued use is neither here nor there.

MR. FLOCH:  I agree with that, Your Honor.  Notice is a precondition that we need to meet.

So, Your Honor, turning to the law here which we think is

important, the Federal Arbitration Act obviously creates presumption in favor of arbitration; but here there is a dispute about whether an arbitration agreement was reached.

In order to determine whether an arbitration agreement was reached, Your Honor needs to look at Florida law. And the case law is clear that federal courts follow the decisions of Florida courts in looking at this issue. There is a case called Galinda (phonetic) --

THE COURT: That law I am familiar with, so you can move on.

MR. FLOCH: Yes, Your Honor.

So back to the issue of notice and assent here. Browsewrap -- let's start with notice.

There's a case called MetroPCS from the Third DCA, and I'll refer to that a lot today, Your Honor. I think it's the case that governs the analysis here and one that the Court should rely on in writing an opinion. But that case says that: Hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice that continued use of the website or services constitutes assent.

So the question about notice requires a court to engage in looking at various non-dispositive factors. Some of those factors can be whether the color, size, positioning, language, design of the hyperlink would put someone on inquiry notice that terms govern their use of a website. And, Your Honor, before

running through that list of non-dispositive factors -- the color, the size, the positioning, language -- I think it's important to talk about MetroPCS because that is the case that governs the analysis here.

And in that case the court enforced the browsewrap agreement. In that case the question was did a cell phone user have inquiry notice of arbitration provisions in various terms. The user in that case received a text message. It said: Thank you for your payment for the cell phone. View terms -- or terms and conditions apply. And the court enforced the agreement there, finding that the "view terms" put the user on inquiry notice that terms governed. And importantly that --

THE COURT: Slow down.

In MetroPCS the plaintiff also admitted that he saw the message and received the message.

MR. FLOCH: Yes, Your Honor.

THE COURT: Right.

MR. FLOCH: In this case we have something similar here, and I'd like to walk through all of the different non-dispositive factors the Court can look to in determining notice. So the first one, Your Honor, is that there are texts from Mr. Lopez, the plaintiff in this case, to Chase Herro, the defendant. There are two texts; one at 14-5 in the docket; and one at 14-6.

In those texts Mr. Lopez is asking Mr. Herro about the platform. And you can clearly see that Mr. Lopez sees the "our

policy" button in the lower right.  It's clear, it's uncluttered.  It's in the lower left-hand corner.  It's clear that the "our policy" button was on the page that he had to use every time he undertook any transaction on the website.

And so much like MetroPCS, here Mr. Lopez cannot say "I didn't see the 'our policy' button;" it's in his very text messages that he saw the "our policy" button.  So, Your Honor, that's point one.  Did he see the "our policy" button?  Yes.

Point two, design of the webpage.  And again we're talking about all of these factors in terms of notice.  The design of the webpage is very different than a cluttered, you know, buried in the bottom of the webpage design.  It's a very simple, clean, uncluttered webpage.  As the affidavit we submitted to our motion shows, there is only a single page on which Mr. Lopez could operate the platform.

THE COURT:  All right.  Let me slow you down and go back to the first point because you want to rely on MetroPCS.

And in MetroPCS the plaintiff had testified that he understood the message contained a hyperlink which he could have used to read the terms and conditions and did not.

So do you have that here?

MR. FLOCH:  Not quite, Your Honor; but we do have those text messages showing he saw our policy over and over again after being on the website for more than two months.

THE COURT:  Right.  You would concede that this is what

the case is about, right?  Obviously, if just having the link were enough, there wouldn't be a whole slew of case law that walks me through, right, color, contrast, and all these other things.

So the fact that it was there I don't think is enough. And in a comparison with MetroPCS, certainly the court in MetroPCS had testimony that not only did the plaintiff see it, he understood what it was and chose not to click it.  So those facts are different.

I'm not saying it's dispositive; I'm just saying you concede that you don't have that here.

MR. FLOCH:  Yes, Your Honor.

But the inquiry notice analysis asks whether a reasonably prudent user should be on notice that there are terms there.  And here we have something that a lot of the cases Mr. Pardo cited don't -- they don't have.  In a lot of those cases you had to scroll down, you know, the footer showing terms and conditions was buried; there is no evidence anyone ever saw it.

In distinction to those cases, here we have the text messages from Mr. Lopez showing the "our policy" button over and over again.  And, Your Honor --

THE COURT:  Sir, I just can't go that far with you because in all of these cases there is a website, there is something where when you're sitting there, you saw that it was there.

You're not going to have a case -- and none of these

cases are like this -- where the button if you will is not there at all.  If it's not there at all, no one is talking about it, right.

The issue is the button is there, the clickwrap is there; the browsewrap is there.  It's there, right.  So the question is not is it there.  The question is:  Is it conspicuous?  There are different questions.

So for you to argue that it being there is sufficient in the same way that MetroPCS was sufficient, I just can't agree with you.  I'm not following you on that because in MetroPCS it is a different posture of the case; and the plaintiff said not only did he see it, he knew what it was, right, and didn't click.  That's not what we have here.

MR. FLOCH:  Yes, Your Honor.  And we can look at the other factors that you mentioned.

First, design of the webpage.  This is not a webpage that's cluttered and complicated.  This is a very simple webpage with not a lot of text on it.  The "our policy" button is in bold with a shadow box around it showing that there was clearly a link to it.  And it was not like the cluttered websites in some of the cases that Mr. Pardo has relied on.  It's much more like the MetroPCS view terms with uncluttered information.

The second factor, Your Honor, that you can look to is proximity to action buttons.  Was the "our policy" button within view of Mr. Lopez while he was using the website?  We submit that

it was.  And if you look at the Zuljevic affidavit attached to our motion, we show that on any button Mr. Lopez had to click to use the platform, whether it was borrowing money, swapping money, looping money, at every single point without scrolling he necessarily saw the "our policy" button.

So when you take design of the webpage, proximity to the action button, those two factors support an inquiry notice finding here.

The third, Your Honor, is both the font and the design of the button.  The font was in all caps.  It was white against a black background; easily seen.  It also is, like I said, in a shadow box.

And then fourth, Your Honor, and I think this is an important one, is context of the transaction.  In looking at inquiry notice in determining whether a reasonably prudent user is on notice that certain terms will govern his relationship with a website, the Ninth Circuit has started looking at something called context of the transaction.  And that question is:  Should the user be on --

THE COURT:  What's the Eleventh Circuit or Florida case law on context?

MR. FLOCH:  It's sort of wrapped into the idea of a reasonably prudent user.  There is no specific case on it, Your Honor.

THE COURT:  Okay.

MR. FLOCH: But in terms of context of the transaction, if you look at the Keebaugh case cited in our brief, as well as the Oberestein case, both Ninth Circuit, they basically say in looking at inquiry notice, you have to look at a variety of nondispositive factors; context of transaction is one of them. And the question is: Would a reasonably prudent user engaged in the type of transaction that the user is engaged in have contemplated a continuing ongoing relationship in which terms would govern the relationship?

THE COURT: It's probably going to be highly unlikely that I am going to hang my hat on a Ninth Circuit view of this that really reframes the entire analysis when there is a significant amount of Eleventh Circuit and Florida state case law on it that doesn't view it, right, in the Ninth Circuit's wrap.

I hear you on what the Ninth Circuit is doing. We can say "Yes, it kind of falls into this." But don't those Ninth Circuit cases really -- it's really a step back, and it's asking you to reframe it in this context analysis, which is not what Florida does.

MR. FLOCH: I think it's just using different words for the same general idea, Your Honor.

THE COURT: I know. But I have the words here from Florida, which I think I have to stick to because if there were no Florida law on the matter, I'd hear you, but there's Florida law on the matter that gives me a framework. I'm sticking to the

framework in Florida law.

MR. FLOCH:  I appreciate that, Your Honor.  And the only reason I raise it is because the question for you is:  Is a reasonably prudent person in Mr. Lopez's position, should he have thought that there were terms that would govern this relationship?  And we submit here, yes, of course.  He was engaging in a million-dollar transaction.  He was continuing to use a platform.  He had to have been on notice that there were some terms.

THE COURT:  I know.  The problem I have with that argument sort of winning the day if you will, is that the society we live in, every transaction involves some kind of terms and condition; everything from parking your car to -- because right now when you park your car, they're all apps, right.  So from parking your car, to investing a million dollars, you've got terms and conditions.  And so at some point it's the rule, with the exception following the rule; or the rule really diminishing the entire analysis on this.

I don't think it's easy to say in this context he had to have known there were policies; because in every context where you're using your computer or an app, there are policies.

MR. FLOCH:  And, Your Honor, we would submit that it's not just he would have known there were policies.  He saw the "our policy" button and was also engaged in the $1 million transaction.  It's clear that it wasn't buried or anything; it was, as we've said, conspicuous based on the design of the webpage, the

proximity to the action buttons, the font. And obviously we talked about his text.

So, Your Honor, on inquiry notice we do think that under Florida law that a reasonably prudent user would have been on inquiry notice that terms governed the relationship.

And, Your Honor, then we get to the assent point. The continued use here over and over again, over many months, is sufficient under MetroPCS to find that Mr. Lopez assented to those terms as well. It sort of blends with the inquiry notice question, but it is a separate question under Florida law.

THE COURT: All right.

MR. FLOCH: Your Honor, would you like me to turn to the 12(b)(6) issues?

THE COURT: Just briefly.

MR. FLOCH: Yes, Your Honor.

As you know, we've made five arguments to dismiss under 12(b)(6).

First, under Rule 9(b) we don't think that Mr. Lopez has come forward with the specific phrase or term or words that were the fraud here. We don't exactly know what he is saying the fraud was. He seems to be saying there was some -- that Mr. Herro lied about liquidity and security.

On liquidity, the only allegation is upon information and belief, and that is not sufficient under Rule 9(b) to argue that a statement about liquidity here was fraudulent.

On the security point, his big argument is that Mr. Herro argues that somehow the platform was a hundred percent secure. But Mr. Lopez has come forward with no evidence, not a single statement that Mr. Herro ever said that. What Mr. Herro said was -- he basically described blockchain, you know: You have your coins on this blockchain. And he hasn't explained exactly how that statement, a statement technically about blockchain, is fraudulent.

So those are our two arguments on Rule 9(b), Your Honor. And we think that because Rule 9(b) applies to all of the claims here, as we have cited in our motion, that would be dispositive, and the case can be dismissed on that ground.

Second is proximate causation, Your Honor. Usually that is a fact question. In certain instances there are cases that say where it's totally clear that there is an intervening cause, the Court can rule as a matter of law that there is no causation; or at least not proximate causation that would tie Mr. Herro's words to the harm suffered by Mr. Lopez.

Here it's clear there was a hack. And there are no allegations that Dough or Mr. Herro inappropriately designed the platform or that the platform was especially vulnerable to hacks. In fact, there is sort of a disconnect between the language that Mr. Herro uses and the ultimate harm suffered by Mr. Lopez. So we think the causation chain is broken; and for that reason all of the claims should be dismissed as well.

The third point, Your Honor, is we have argued that there is no justifiable reliance for a negligent misrepresentation claim.  There are cases that basically say when the recipient of an erroneous or a representation that they should know not to be taken or interpreted a certain way, they cannot hide behind that representation and argue negligent misrepresentation.

And here Mr. Herro never said:  Hey, the platform is perfect.  It will never get hacked.  What he described was essentially what blockchain is.  And so for Mr. Lopez to come forward and say:  Well, I interpreted that as a guarantee against hacking in all instances.  He cannot possibly have interpreted it that way.  And in other words, he did not justifiably rely on Mr. Herro's statements.

Two more arguments, Your Honor, on 12(b)(6).  First, we don't think Mr. Lopez has alleged enough to show a duty here; a fiduciary duty.  The text messages described in the complaint, all they do is they describe Mr. Herro, in fact, walking him through the platform.  It's like an arm's-length transaction where he walks him through how to use the platform.  He's not an accountant, and he's not a lawyer.  He's not agreeing to hold the funds in escrow in any way.  In fact, he can't hold the funds because Mr. Lopez, by virtue of what this product is, has retention of the funds.  So we don't think there have been allegations that would allow a fiduciary claim there.  The duty part is missing.

And finally, Your Honor, we don't believe that FSIPA, the security count, should apply here.  This goes back to the idea that in order to have a security claim, you need to allege that there is an investment contract under Howard, and that requires that the managerial efforts of others -- the unique managerial efforts of others is what would allow you to make money off your investment.

Here this product is -- it's unique in that you put money on a blockchain, and smart contracts allow to you borrow and lend. Mr. Herro and the people associated with Dough don't do anything. Mr. Lopez is the one making every decision about how to borrow and lend and make money.  So for that reason we believe the FSIPA claim fails, too.  So, Your Honor, again I would like to just reiterate why we think the browsewrap should be enforced here.

We believe there is both inquiry notice and assent here. On inquiry notice the Court can look to a variety of nondispositive factors.  Again, design of the webpage is the first factor; totally uncluttered.

Second is did Mr. Lopez see the button at every opportunity he had to transact on the website?  Yes.  The affidavit from Mr. Zuljevic shows that every time Mr. Lopez was on that site doing anything operational -- borrowing, repaying, lending -- he necessarily saw the "our policy."  There was no scrolling that had to happen; it's right there.  It's a very uncluttered website.  It's very different than the website --

THE COURT: So you so need to slow down.

MR. FLOCH: I apologize.

THE COURT: My court reporter is very kind to lawyers. When she coughs like that, it's my cue that you don't have much of a record at this point. You need to slow down, sir.

MR. FLOCH: Yes, Your Honor. I apologize.

Again, Mr. Lopez saw the "our policy" button during every operational action he could take.

THE COURT: What say you to the issue that what it says is "our policy," as opposed to terms and conditions? You know it could be a policy, it could be an environmental policy on, you know, "Aren't we green because we have a platform and we don't send you paper?" It could be a diversity and inclusion policy. It could be all sorts of policies.

This is obviously an arbitration waiver; it's not a term and condition of use. The language here is a little different than, for example, MetroPCS, which I think you represent is your strongest case. It's a little different if I'm using a platform and I'm looking at it and thinking "Oh, these are the terms and conditions of its use," as opposed to the policy.

MR. FLOCH: Yes, Your Honor. Actually I think the broader language perhaps helps us because it basically says these are the policies that govern the website.

THE COURT: Correct. It's the policies that govern the website; not the policies that govern the relationship you're

having with the company.  That's my issue with policy.  I mean, we're lawyers, right, so we can argue about words.  There is a difference.

There is a difference when somebody sees policy.  It can be "We have a company policy of X."  The company's policy doesn't bind me; terms and condition of use could bind me.  But why is the fact that you're using policy not something I should be concerned with?

MR. FLOCH:  I think the question really is:  What would a reasonably prudent user think when looking at that policy?  And I understand what Your Honor is saying; that terms and conditions maybe has a different interpretation for the reasonably prudent user.  I do think the reasonably prudent user looking at that would think this is the policy that governs my use of the website.

THE COURT:  I know.  But when you think of a term or a condition, you know, "A condition of using this website is that if you use it, you've waived your right to be in federal court."

A policy that "We like arbitration," right, that's a policy.  Like I'm thinking to myself "All right.  The company can have all sorts of policies.  The fact that I engage with you as a consumer doesn't mean I'm abiding by your policy."

Terms and conditions, at least in -- for whatever it's worth, and I think in this case it's going to be worth a lot, right -- policy seems different in terms of the kind of notice it puts somebody on.

MR. FLOCH:  And, Your Honor, there are some cases, Derriman vs. Main & Mizzen [verbatim], where it just said "view terms" in a browsewrap was enforced.  And I take your point; maybe "terms" and "policy" are different.  We tend to think that.  If it says "our policy," that would be broader; and, in fact, it would cover everything.  And if Mr. Lopez had clicked the "our policy" there is an executive summary with the arbitration waiver right up there.

THE COURT:  It's not a question of whether policy is broader; it's whether or not "policy" connotes the same kind of message that in order to use this platform, you have to abide by certain things.  Do you see what I'm saying?

MR. FLOCH:  Yeah.  And, Your Honor, maybe that's a question of fact really to ask Mr. Lopez about what he thought when he saw "our policy," rather than "terms and conditions."

THE COURT:  I have a pretty good guess if we asked him that.

My problem is it's a motion to compel arbitration, and so I have to decide it before I allow you to take the discovery on it.

MR. FLOCH:  Well, there could be limited evidentiary discovery on those specific issues; what he saw, what he knew, what he interpreted.

THE COURT:  I know.  I am so anxious to get this case going is my issue with that; very anxious.  Not as anxious as you

are, I understand; or as the plaintiffs are.

But I don't see this as needing discovery on that point because I have to make the determination as to what the reasonable person would have seen, so.  All right.  Thank you very much, counsel.

MR. FLOCH:  Thank you, Your Honor.

MR. PARDO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PARDO:  The plaintiff's theory rests on a but-for analysis.  But for the defendant's fraudulent misrepresentations, we wouldn't have even been on the platform.

THE COURT:  Let's go to the motion to compel arbitration first.  I'm not going to get to those arguments in this court, unless you prevail on the motion to compel arbitration.

MR. PARDO:  Correct, Your Honor.

It is conceded that this is a browsewrap agreement; not a clickwrap agreement.  For it to be a browsewrap agreement, the two strongest cases we would direct Your Honor to are the Valiente vs. NexGen case.  That's the decision by Judge Altman.  And the Bell vs. Royal Seas case that we cited in our brief.

Now, I want to take them in reverse order.  The Bell vs. Royal Seas case is the case that had that big lime green "click here" button, and the prompt says that "By clicking this link, you acknowledge terms and conditions mandatory arbitration policy," the use of the words "mandatory arbitration," even the use of the

word "arbitration" is there.

THE COURT:  That, if you were to put it on a continuum, that's on an extreme continuum.

MR. PARDO:  Correct.

THE COURT:  That one is.

MR. PARDO:  One derivative less is that it is clearly a hyperlink.  And by that I mean when looking at the Dough Finance site, the mere use of white against a black background is not sufficient.  And you look at whether or not the link was clearly a hyperlink or whether you would have had to scroll your cursor over the words "our policy" in order to determine that it was a hyperlink.  The hyperlink wasn't a clearly contrasted color, like blue, which consumers are used to seeing.

The Valiente-NexGen case is the Altman case where you have to ask yourself:  How many layers deep do I have to go in order to be on inquiry notice that the terms and conditions for which the policy owner is seeking to enforce actually contains an arbitration policy?  And the argument here is that, one, as Your Honor noted, the use of the words "our policy" is broad, not specific "these are the terms and conditions of our website."

Not only would Mr. Lopez have to determine that seeing the words "our policy" would warrant a click, he'd have to know that it was a hyperlink.  And then to go into the hyperlink, he would have to actually go and see the words in the arbitration policy itself.

And just for context, Your Honor, compelling arbitration would be to compel the Lesean arbitration according to Singaporean law, with an absolute exculpation and waiver of all rights and liability.  So the consequence of compelling arbitration is not like "Let's hire Jan, and sit here in Miami."

THE COURT:  I know.  But can I look at that?  What empowers me to look at that?

MR. PARDO:  The unconscionability of the term itself, I think, is at least a factor to consider.

THE COURT:  What case lets me do that.

MR. PARDO:  I don't have case law on point to cite to you.

THE COURT:  I know.  I know.  I thought this job -- you know, for people who think that the job is to sit up here and just do what you think to do is right, I tell people I'd be home at 3:00 o'clock every day.  And you know, Mr. Pardo, I'm never home at 3:00 o'clock based on all the other cases you have in front of me.  And if I just were to decide "Oh, this is what I think is right or fair," it would be a lot easier.

I have to stick to all these cases you're citing me.  There is no case law that requires me to do that, so I'm not going to do that.

MR. PARDO:  Where I started was the idea of a fraudulent inducement; not on whether or not the fraudulent inducement was sufficiently pled; we contend it was.  But we don't get to an

enforceable contract, unless Your Honor finds --

If we were fraudulently induced into even going on to the site but for the misrepresentations of Mr. Herro, we would not have been in a posture where we would have even been presented with a policy to click and a potentially enforceable browsewrap contract.

So we believe that the fraudulent inducement claim specifically, that the negligent misrepresentation claim specifically would be immune from a mandatory binding arbitration.

Your Honor noted that use alone doesn't satisfy assent. Regarding the comment that this is not -- that this was a simple website, that it would have been patently obvious; lest we forget that this was a website designed to facilitate complex financial transactions.  And at the bottom of the screen Judge Altman noted that a black on white contrast at the bottom of the screen where there's a whole bunch of other activity, colors, we don't know whether there's sounds here, but the idea that there's financial activity, charts and graphs, and you're buying and selling money, it's not like MetroPCS where you're prompted with a text message. It's not that clear.  There is a lot more going on.

Your Honor, I believe, noted that there is no evidence that Mr. Lopez actually saw these terms and conditions.  And I want to distinguish the "how to" guides which are on the Dough Finance website from the "our policy" and the "terms and conditions," which are separate documents; meaning, Mr. Lopez,

even though he was aware of the "how to" guides on the policy, was not specifically aware of this term and condition, including the arbitration clause.

That's the argument we have on the browsewrap enforceability.  We believe Your Honor has already addressed all the points.  Unless you have any pointed questions, we'd rest on our papers on those issues.

THE COURT:  Okay.

MR. PARDO:  The 9(b) issues we believe that we have adequately pled the specific misrepresentations.  Case law requires the time that the misrepresentation was made, who it was made by, to whom, the where and the place, the manner with which the misrepresentation was made, and the substance of the misrepresentation.  We believe that the complaint sufficiently and specifically alleges that it was in April, May of 2024, Chase Herro made communications to Jonny Lopez using iMessage, FaceTime audio, oftentimes using verbatim transcripts of the substance of the communication itself.

And the three specific misrepresentations are the liquidity on the platform, the amount of money on the platform in order to support the transactions taking place, the security of the platform and whether or not the platform was susceptible to outside forces, and finally, this is different than liquidity, the ability of Mr. Lopez to take his money off of the platform in a timely manner, timeliness.  We believe that those three specific

misrepresentations form the basis of both the fraud and negligent misrepresentation claims.

With respect to proximate causation, this is a but-for analysis. But for the misrepresentations of the defendant, the plaintiff would not have engaged in commerce, would not have gone on the website, and would not have put the millions of dollars of his own currency or cryptocurrency on the platform.

There is an allegation that Mr. Herro was responsible for, wrote, and sourced the code; and after the, quote, unquote, flash loan attack, that Mr. Herro reached out to Mr. Lopez and said: I'm going to take care of it. So not only does that speak to the causation element that he accepted responsibility, we believe that that allegation also speaks to the fiduciary duty as well.

Turning very briefly to the justifiable reliance, we've cited the Byrnes vs. Small, a Middle District of Florida case, which holds for the proposition that justifiable reliance doesn't apply.

Breach of fiduciary duty. The nature of the platform was that Chase Herro reaches out to Mr. Lopez and said: Look at this fantastic online cryptocurrency platform that I made. As alleged, you can make a whole lot of money. Trust me, I built this platform. What do you think, I made some sort of toy? Take the risk. Trust my lead, and I will make sure. Let me walk you through step by step how to make all this money. So we believe

that the specific nature of the relationship gives rise to the fiduciary duty claim.

And finally, Your Honor, FSIPA, you have heard me say before, if you find that one of the three other claims lacks, then perhaps FSIPA is not necessary.  I concede it's --

THE COURT:  You'd give up on FSIPA.

MR. PARDO:  I wouldn't say I have given it up.  I believe it's adequately pled.  It's not necessary.  I recognize that the Howey Test is a bit of a stretch.  I am not going to stand here and say it is our strongest argument; but we do believe that it is adequately pled, and we rest on our papers on that argument.

THE COURT:  All right.  Thank you, counsel.

I would like you to address the Valiente case.  Counsel has noted that his strongest cases are Valiente and Bell.  I think the strongest case is Valiente.  You can address that.  I don't think you really addressed that in your first argument.

MR. FLOCH:  Yes, Your Honor.

The Valiente case had to do, I believe, with spray bottles, ceramic spray bottles.  And the website, from my memory, it was very deep in that there were lots of different pages to go through to get to a purchase.  You had to scroll all the way down to see the terms of use.  And the terms of use --

And, Your Honor, I may have a picture of it, if that would help you --

THE COURT:  Sure.

MR. FLOCH:  -- from the case.

THE COURT:  Oh, from Valiente?

MR. FLOCH:  Yes.

THE COURT:  No, I have it.  I have all the cases here.

MR. FLOCH:  Yeah.  There are pictures in that case, but there were lots of other buttons surrounding terms of use.  I think there was a privacy policy and something else.  Judge Altman found that it was a totally cluttered website, where it was basically impossible to ever find the terms and conditions for a user walking through the website.

Here we have something totally different.  And, Your Honor, I am holding up the picture of our website.  I know you have it, but just to level-set us.  This is the entire website.

THE COURT:  I know.  But when I look at that, is that 14?  What's the number on that?

MR. FLOCH:  Your Honor, that is 10-1.  It's screenshots from Mr. Zuljevic's --

THE COURT:  Hold on, I have it.  I have it right here.  The color one is the one I have.

So, I mean, I understand it's not a website selling products like Valiente was.  But when I look at this, it is all the way at the bottom left, right.  It just says "our policy," very close to and almost with the same font and size to "All rights reserved Dough," right, "2024."

I mean, for example, when you look at it, it's not in

color.  There is blue on this page, there's green.  It's not next to the button where you browse, right.  It's not next to the button where you connect or disconnect.  It's almost, you know, when you look at it, it's in a border on the bottom that almost is, like, a footer to a page.  It doesn't even look to be part of the page.

MR. FLOCH:  The important point about the website, Your Honor, though is it exists on a single screen.  This is not like NexGen where you click through over and over and then buried at the bottom are the terms of service.  This is a one screen website.  And if you click supply or swap or withdraw or loop, you get a popup that continues to show the "our policy" in the bottom left.  It never goes away.

THE COURT:  Right next to "All rights reserved Dough 2024."

MR. FLOCH:  Yes.

THE COURT:  Unlike all these other cases where the terms and conditions button is next to another important button, right; sale, purchase, book, right, buy.  This is alongside a totally superfluous and meaningless, right, within the right side having -- what is that?  I don't even know what those three little round things are.  On the same bar, on the left you have "our policy," then you have "All rights reserved Dough 2024."  What are those three little buttons there on the side?

MR. FLOCH:  Your Honor, I'm not sure I know what buttons

you're talking about.  Is it the Twitter emblem?

THE COURT:  Right, so it's Twitter.  And then what are the next two?

MR. FLOCH:  Your Honor, I don't see any on mine.

THE COURT:  Yeah, there's three.

MR. PARDO:  10-1, page 3.

THE COURT:  Oh.  So, yes, if you look at 10-1, page 3, for example, the first screen has the Twitter, but then the other screens have three on them.  And if you go to 10-1, page 5, that's the one that I was looking at.  It's got three.

MR. FLOCH:  Are you talking about the Supply ETH?

THE COURT:  No.  Do you see where there is a little Twitter thing?

MR. FLOCH:  Oh, yes.  Sorry, Your Honor.  Yes.  Those are other, I believe, Instagram or other social media websites.

THE COURT:  Probably Instagram and Facebook.  The glasses I happen to be wearing today aren't that strong, so it looked like the bird; but I couldn't see what the other two were.

My point is in terms of importance, conspicuity, it's literally lined up with Twitter, Facebook, Instagram, and "All rights reserved."  The level of conspicuousness here is low, very low.  It's not a different color.  It's not next to any other box that you have to click, right.  In all the transactions that he would be doing, he's got to click, obviously, in the body of it or at the top, right, where it says "Mainnet" and "Disconnect."

Nowhere -- unless he's tweeting something, and I don't think that's what this means, I think that it's not that you would be tweeting this.  It's the company's Twitter, Instagram, and Facebook page I would assume is what that is, right; not:  Don't you want to tweet your transaction?

MR. FLOCH:  I believe that's the case, Your Honor.

THE COURT:  Right.  So he wouldn't be clicking those three things to transact.

MR. FLOCH:  Well, Your Honor, if I may.  I think we have a different interpretation of the way the website operates.  He necessarily has to click swap, withdraw, loop, supply, repay.

THE COURT:  Correct.

MR. FLOCH:  Those are the actions.

THE COURT:  Correct.  So that's what I'm saying.  But those are in boxes above this bottom line that says "our policy."

MR. FLOCH:  Right.  But the "our policy" button is always there; he can see it.  It's never buried, which distinguishes this case from NexGen.

And the second point, Your Honor, to distinguish it from NexGen is, again:  What would a reasonably prudent Internet user in Mr. Lopez's position transacting a million dollars on a crypto platform be expected to have thought that terms governed his relationship with this platform?  Our answer is yes.

THE COURT:  But then he would have had to have thought that the terms and conditions that govern the relationship between

the parties is found in a policy.

MR. FLOCH: Right, Your Honor. And I think that a reasonably prudent user sees the terms "our policy," and thinks: That's the policy that governs my relationship with this website. I'm not really sure there is any other way to read it.

THE COURT: I'm telling you I'm reading it in a different way.

MR. FLOCH: Yes, Your Honor.

THE COURT: So there is a way because I happen to be looking at it a different way in the examples I gave you, right. If I'm a company, I have all sorts of policies, right. Go to Target. Target has a million policies; employee policies, environmental policies. I'm just picking Target randomly obviously, right.

I could even pick a bank. Let's go to a bank. Bank of America has policies for the environment, EI policies, you know, good neighbor policies. I can give you a thousand policies probably on the website, all the different policies Bank of America has.

My relationship with the bank isn't governed by their policies as an institution; it's governed by the terms and conditions of my activity with them. I think the policy issue here is not to be understated.

MR. FLOCH: And, Your Honor, I think the answer I'd have to you for the example you gave is Bank of America, if they want

you to look at a policy that relates to you as a user, they put the policy there.

This is what Dough did if they wanted a policy that related to the users. This company doesn't exist outside the website, so they're saying: This is our policy. It governs the relationship between us.

THE COURT: I don't think a policy governs relationship between people. The policy is a statement of the companies. The relationship between the people -- between the parties is governed by the terms and conditions of the relationship, which is why I think policy is a tough one for you here.

And by the way, you know, obviously we're all looking at the same thing. This isn't even close to the other cases in terms of conspicuousness, right. The page has different colors because it has green, it has blue, it has action items, right, in green for example.

This is literally at the very bottom. And the fact that it keeps appearing, I get it; that's a point in your favor. But it's shadowboxed. The lettering is no bigger than completely irrelevant things, like "All rights reserved Dough 2024," and Twitter, Instagram, and we're just going to assume it's Facebook because we're from that generation where people still use Facebook, so social media.

MR. FLOCH: Your Honor, if I might make just two more points. And I know, I understand where Your Honor is coming from.

The MetroPCS case, the reason I keep citing it is there is language in there that says a person has no right to shut his eyes or ears to avoid information and then say he has no notice. And the reason I kept talking about the text messages and showing Your Honor that the text messages from Mr. Lopez to Mr. Herro basically had this screenshot in it was because he saw "our policy" over and over, and he can't now say:  Well, I didn't click it.  He clearly saw that it was there.

THE COURT:  But Metro is different than this in that MetroPCS is sending -- and we all have phones I'm sure and get these apps where it says "Here are the terms and conditions," and it's a text message and it says "Click here for our terms and conditions," and the terms and conditions are underlined, they're in a different color, and again it says "terms and conditions." Not to mention the fact that MetroPCS, the court affirmatively had evidence and hung its hat on it that the plaintiff understood those were the terms and conditions and chose not to read them.

MR. FLOCH:  Yes, Your Honor.

And the last point I make is I don't think there is a magic language requirement under Florida law.  I know Your Honor doesn't think that as well.  But our point is that inquiry notice is a fact-specific analysis; and whether it's the term "policy" or "terms," I don't ultimately think is dispositive taking the totality of the circumstances of the website here.

But I hear Your Honor's point that:  What would a

reasonably prudent user think are policy or terms, that's a question for the Court. And I appreciate your time, Your Honor.

THE COURT: All right. Look, this is where I'm at. I wanted to have the oral argument on this, and I'm anxious to move this case along. This is like deicing planes at LaGuardia, right. I have to deice the first plane, the oldest plane, the one that's been sitting there the longest. That doesn't mean plane number 10 hasn't been sitting there a really long time and the people on plane number 10 don't have very important things to attend to that are just as important as everybody else's or maybe even more important than the folks on the first plane.

I'm trying to get to this order as quickly as I can. It should not be a surprise to you that the order is going to say it's going to deny your motion to compel the arbitration. I don't think that under Florida law and under the standards I have to look at a reasonable person would have been on notice of this arbitration clause.

For whatever it's worth, I don't think it's close, right, to the other cases. There is no color that pops out at the person. The design itself puts it on the same line as the most irrelevant things one could imagine, right; all rights reserved, the company's Twitter, Instagram, and Facebook page, right. It's nowhere near the action buttons. And I'm very persuaded by the language of it, by it's "our policy" as opposed to "terms and conditions." I have to write an order on that, obviously, because

it's an order that's subject to appeal, and so I'm not going to -- I'm happy to rule from the bench.  I love to rule from the bench when I can because it moves things along, but.  You could take my oral ruling to the Eleventh; I would rather you not do that.  I am going to sit and write an order.

If you think it's not something that you're inclined to appeal, in any event, then you can take my oral ruling, and you can move this case along not so fast because I would be inclined to grant the 12(b)(6) without prejudice because I think there are a number of things that can be pled with greater specificity.

And I think we all know that last count, it can die a lot of different ways, but I think prudence would guide that it just not appear in the amended complaint because you have nothing on that last one.  I think it has to be amended, but I've got to do the motion to compel arbitration, so, like I said.  And I've got to write an order on it.  We're trying to get to it as quickly as we can.  This is a fairly older order if you will.

I am in trial.  I've been in trial for it feels like months back to back to back.  This week I happen not to be in trial.  I start again on Tuesday, and I have four trials in a row, so that's just where I'm at.  So I'm going to get to it as quickly as I can because, like I said, I have to write a significant order.

If you think, like I said, it's not something you're going to appeal, then by all means let the Court know.  You can

send us an email to the NEF box; and then I can write something that's a lot more cursory on that issue. And I will give then on the 12(b)(6) more direction on where I do think that the complaint is lacking. That's where I am.

I apologize. I'd love to have gotten to this months ago. I'm still digging out. I'm still new. I'm still digging out. And I'm trying to do things in order, but the criminal cases on the trial docket, I have to do those, and I have even had a number of civil cases much older than this take precedence, and I have to try them. And I have great law clerks and, of course, they are a great help, but I'm the one that has to look at the order and consider it.

So at any rate, I appreciate your time. I know 8:30 is tough, at least it is for me, so I appreciate you being here promptly and being prepared. And with that, we're in recess.

(Proceedings recessed at 9:28 a.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE:  11/12/25          /s/Vernita Allen-Williams
                         VERNITA ALLEN-WILLIAMS, RMR, FCRR
                         Official Court Reporter
                         United States District Court
                         Southern District of Florida
                         400 North Miami Avenue
                         Miami, Florida 33128
                         (305) 523-5938