## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 25-cv-20405-JB

JONATHAN LOPEZ,

       Plaintiff,

v.

CHASE HERRO,

       Defendant.

_____/

### ORDER ON MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, MOTION TO DISMISS THE COMPLAINT

**THIS CAUSE** comes before the Court on Defendant, Chase Herro's ("Defendant" or "Herro") Motion to Compel Arbitration, or in the Alternative, Motion to Dismiss the Complaint, (the "Motion"). ECF No. [10]. Plaintiff, Jonathan Lopez ("Plaintiff" or "Lopez"), filed a Response, ECF No. [14], to which Defendant filed a Reply, ECF No. [22]. The Court held oral argument on the Motion (the "Hearing"). ECF No. [35]. Upon due consideration of the parties' submissions, the pertinent portions of the record, the relevant authorities, and for the reasons stated below and at the Hearing which are incorporated herein, the Motion to Compel Arbitration is hereby **DENIED**, and the Motion to Dismiss is hereby **GRANTED**.

### I.   BACKGROUND

Lopez is an entrepreneur who invested $1,000,000.00 worth of Etherium cryptocurrency ("ETH") into an online cryptocurrency platform known as Dough Finance. ECF No. [1] at ¶¶11, 20, 50. Dough Finance was created and launched by Herro and is described as a "decentralized finance" project that provided "investment

1

opportunities for investors using blockchain-based smart contracts to facilitate investment opportunities for investors." *Id*. at 20–21.  Lopez alleges that Dough Finance functioned like a crypto asset investment fund that would receive and deploy investors' assets. *Id*. at 22.

Lopez alleges that Herro led him to believe that he would profit from Dough Finance's platform.  *Id*. at ¶ 28.  For example, Herro made the following representation in a text message: "[t]here is liquidity at anytime, anywhere, always, because the money is on the chain with escrow . . . The money is locked on the chain where only you can get it out." *Id*. at ¶ 31.  On other occasions, Herro shared screenshots of bank account transfers showing millions of dollars to demonstrate that the platform was receiving investments from other investors. *Id*. at ¶32. When Lopez asked specifically about the liquidity of the platform, Herro told him that the liquidity "was over Seven Hundred Million ($700,000,000) Dollars." *Id*. at ¶ 34.  Herro would often characterize Lopez's utilization of the platform as an "investment," and assured him that he was "guaranteed" to make money on the platform, and that it was "very lucrative". *Id*. at ¶¶ 36–37, 49.  Lopez alleges that based on these representations, in May 2024, he invested $1,000,000 of ETH into Dough Finance. *See id*. at 50.

After his investment, Lopez continued to communicate with Herro on ways to maximize his profits. *See id*. at ¶¶ 38–44.  For example, Herro recommended that Lopez take advantage of a "crypto trick" known as "looping" in order to maximize his profits. *Id*. at ¶ 38.  According to Lopez, Herro sent text messages, voice messages, and made several FaceTime calls with Lopez to walk him through the process of

looping and so that Herro could verify he had done it correctly. *Id.* at ¶ 40–41. Lopez alleges that between the time of his initial investment and its ultimate loss, Herro was monitoring his investment and messaging him about its growth. *See id.* at ¶ 52.

One month later, on July 12, 2024, Dough Finance suffered a "flash loan" attack, resulting in the disappearance of Plaintiff's investment. Plaintiff alleges that Defendant promised to make him whole, but never did. *Id.* at ¶¶ 57, 61. Dough Finance has since closed its operations. *Id.*

## II.    THE INSTANT ACTION

On January 27, 2025, Lopez filed the Complaint, asserting claims for (I) negligent misrepresentation, (II) breach of fiduciary duty, (III) fraud, and (IV) violation of the Florida Securities and Investor Protection Act ("FSIPA"). *See generally* ECF No. [1]. Lopez seeks actual, consequential, and incidental damages, as well as disgorgement, pre- and post- judgment interest at the highest legal rate allowed by law, attorney's fees and costs, and punitive damages. ECF No. [1] at 16.

Herro now moves to compel arbitration arguing that the matter is governed by an arbitration provision found on Dough Finance's website, or in the alternative, that the matter should be dismissed because Lopez has failed to state a cause of action. As to the arbitration provision, Herro argues that Lopez's relationship with Dough Finance was governed by its website which set out "Terms of Use," that noted a "binding legal agreement with all users of the site," and contained a mandatory arbitration provision. ECF No. [10] at 4. Defendant argues that these terms of use were linked in the webpage's "OUR POLICY" hyperlink at the bottom of the screen,

3

and that the link remained visible to any user at any point in their interaction with Dough Finance's platform. *Id.* at 4–5. Specifically, the platform's webpage, according to Herro, would have appeared to users, like Lopez, as follows:



*Id.* at 5. Herro argues that because the link was visible to its users at all times, Lopez had both inquiry notice and actual notice of the arbitration provision, and therefore, is subject to it. *Id.* at 6–11.

In his Response, Lopez argues that the arbitration provision is contained in an inconspicuous and unenforceable "browsewrap" agreement, such that it does not give him adequate notice that he was subject to a mandatory arbitration provision. ECF No. [14] at 5–13.

In the alternative, Herro argues that the Complaint should be dismissed for a variety of pleading deficiencies. *Id.* at 11–19. First, Herro argues that Lopez's fraud claims must be dismissed because they fail to meet the heightened pleading standard under Rule 9(b). *Id.* at 12–13. Next, Herro argues that the Complaint fails to plead

4

the "causation" element for the negligent misrepresentation count.  *Id.* at 14–16.
Herro also argues that Lopez fails to state a claim for breach of fiduciary duty because
Lopez fails to adequately plead a fiduciary relationship existed between them.  *Id.* at
16–17.  Lastly, Herro argues that Lopez fails to allege that Herro solicited Lopez to
purchase a security and, as a result, cannot successfully allege a claim under the
FSIPA.  *Id.* at 17–19.

In his response, Lopez argues that the Complaint meets the heightened
pleading standards, and alleges facts that, if taken as true, support each count alleged
in the Complaint.  *See generally* ECF No. [14] at 14–21.

The Court addresses the Motion to Compel Arbitration and the Motion to Dismiss
in turn below.

## III.    MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") "creates a presumption of arbitrability,
and under it, any doubts concerning the scope of arbitrable issues should be resolved
in favor of arbitration."  *Mason v. Midland Funding LLC*, 815 F. App'x 320, 323 (11th
Cir. 2020) (citation omitted).  However, this presumption "does not apply to disputes
concerning whether an agreement to arbitrate has been made" but, "[r]ather, the
threshold question of whether an arbitration agreement exists at all is "simply a
matter of contract."  *Id.* at 323 (citations omitted).  Because arbitration is a matter of
contract law, "a party cannot be required to submit to arbitration any dispute which

he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 648 (1986) (citations omitted).[1]

A court must consider three factors when determining whether to compel arbitration: "1) whether a valid agreement to arbitrate exists; 2) whether an arbitrable issue exists; and 3) whether the right to arbitrate was waived." *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.,* 376 F. Supp. 3d 1298, 1304-05 (S.D. Fla. 2019) (citations omitted). Generally, only signatories can be bound to an arbitration clause. *See Emps. Ins. of Wausau,* 251 F.3d at 1322 ("under the FAA, no party can be compelled to arbitrate unless that party has entered into an agreement to do so.") (citation omitted). However, Florida law allows non-signatories to be bound under limited circumstances, namely: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil piercing/alter ago; and 5) estoppel." *Taylor Grp., Inc. v. Indus. Distributors Int'l Co.,* 506 F. Supp. 3d 1256, 1267 (S.D. Fla. 2020), aff'd, 859 F. App'x 439 (11th Cir. 2021) (citations omitted).

Here, the arbitration agreement is only accessible to users by opening a weblink located at the bottom of the Dough Finance platform. In general, these types of internet agreements are categorized as "clickwrap" agreements or "browsewrap" agreements. *Valiente v. StockX, Inc.,* 645 F. Supp. 3d 1331, 1337 (S.D. Fla. 2022) (citing *Arencibia v. AGA Serv. Co.,* 533 F. Supp. 3d 1180, 1190 n.3 (S.D. Fla. 2021)).

---

[1] Federal law "establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.,* 251 F.3d 1316, 1322 (11th Cir. 2001) (citation omitted).

Clickwrap agreements are "when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions." *Id.*  Courts generally find that clickwrap agreements are enforceable because the user has been put on notice of the terms and conditions as they "pop-up" on the screen, and the user has been given the opportunity to read the terms before consenting to them.  *Mason*, 815 F. App'x at 322; *see also Valiente v. Nexgen Glob., LLC*, No. 22-CV-22480, 2023 WL 6213583, at *11 (S.D. Fla. Sept. 25, 2023), *aff'd sub nom.* No. 23-13308, 2025 WL 3140480 (11th Cir. Nov. 10, 2025) ("*Nexgen*") ("Courts have also largely approved the use of clickwrap agreements for the same basic reason that they have approved the use of shrink wrap agreements: the consumer is on notice that an agreement exists and receives the opportunity to review the terms of that agreement and to consent."); *Orellana v. Roblox Corp.*, 769 F. Supp. 3d 1273, 1281 (M.D. Fla. 2025) ("[clickwrap agreements] are generally enforceable") (citing to *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022)); *Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309, 1319 (N.D. Ga. 2025) ("In general, the Eleventh Circuit has held these types of agreements—known as "clickwrap" or "scrollwrap" agreements—can be enforceable, assuming the applicable elements for a valid contract are otherwise met.").

Browsewrap agreements, on the other hand, are "when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgment during the checkout process.  In short, the purchaser can complete the transaction without visiting the page containing the terms and

conditions." *Valiente*, 645 F. Supp. 3d at 1337 (citing *Arencibia*, 533 F. Supp. 3d at 1190 n.3.  A browsewrap agreement can be enforceable when a user "has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp.3d 1252, 1261–62 (S.D. Fla. 2021) (citing to *Bell v. Royal Seas Cruises, Inc.*, No. 19-cv-60752, 2020 WL 5742189, at *5 (S.D. Fla. May 13, 2020)).  "When there is no evidence that a website user had actual knowledge of the agreement, the validity of a browsewrap agreement then turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Fridman*, 554 F. Supp. 3d at 1260 (citing to *Nguyen v. Barnes & Noble, Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014) (internal quotations omitted). Whether a reasonably prudent user is on inquiry notice turns on the clarity and conspicuousness of the terms which, for web-based contracts, are a function of the design and content of the relevant interface.  *Id.*  "To be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Nexgen Global, LLC*, 2023 WL 6213583 at *7 (citations omitted).

The parties do not dispute that the agreement at issue is a browsewrap agreement because a user does not have to click a box indicating that they accept any terms in order to use the platform or interact with it in a meaningful way.  *See* ECF No. [10] at 9–10; ECF No. [14] at 5.  As such, the Court must now determine whether the agreement provided Lopez either actual knowledge of the provisions therein, or

whether the "OUR POLICY" hyperlink was conspicuous enough to put a "reasonably prudent person on inquiry notice" of the arbitration provision.

Herro argues that Lopez clearly would have seen the "OUR POLICY" hyperlink at the bottom of the webpage given that it was on every page of the site, and as such, Lopez was on actual notice of the terms that were found once the "OUR POLICY" hyperlink was clicked.  ECF No. [22] at 3.  In support of his argument, Herro relies heavily on *MetroPCS Communications, Inc. v. Porter*, 273 So. 3d 1025, 1029 (Fla. 3d DCA 2018).  There, MetroPCS sent monthly text messages to customers which informed the user that "the *terms and conditions* applied to use of services."  *Metro PCS*, 273 So. 3d at 1028 (emphasis added).  The user admitted he saw the messages and understood that that he could review the terms and conditions, but chose not to. *Id*. at 1029.  The Court held that the reference to the terms and conditions in the monthly text messages, coupled with the plaintiff's admission that he had acknowledged the reference to the terms and conditions, was sufficient to put the plaintiff on notice that his contract with MetroPCS was subject to arbitration.  *Id*. Herro argues that the facts here are analogous because the "OUR POLICY" hyperlink was on every page of the website's platform, and Lopez even included screenshots of the webpage containing the "OUR POLICY" link in certain text messages sent to Herro.  *See e.g.*, ECF No. [14-2] at 7.  Herro argues that Lopez cannot now choose to "shut his eyes" in order to negate notice.  *Id*.  (citing to *MetroPCS*, 273 So. 3d at 1029). After a thorough review of the images of the website that are in the record, the Court finds that the "OUR POLICY" link was insufficient to place a reasonable user on

notice that the link contained terms or conditions that would bind the relationship between the parties.

As a preliminary matter, the Court first examines the language at issue here, as compared to the language typically found in enforceable browsewrap agreements. Based on the Court's review, it appears that most enforceable browsewrap agreements include the words "terms" or "conditions." *See e.g., Temple v. Best Rate Holdings LLC,* 360 F. Supp. 3d 1289, 1305 (M.D. Fla. 2018) (holding that the "Terms and Conditions" hyperlink requiring the user to affirmatively acknowledge it before proceeding was conspicuous enough to provide reasonable notice to a prudent user.).[2] The use of these words is important because "terms" and "conditions" are common contract terms. Their presence on a hyperlink, therefore, in and of themselves, could serve to put the reader on notice that within the hyperlink is the contract which governs the relationship between the parties.

The word "policy" does not mean the same thing, and does not have the same import as the words "terms" or "conditions". *See* POLICY, Black's Law Dictionary

---

[2] To be clear, simply using contract language like the word "term" is not sufficient, as courts are still required to examine whether language and format provided notice in the context at issue. *See Valiente v. Nexgen Global, LLC,* 2023 WL 6213583 at *9 (finding that the plaintiff could have had to "first, find the Terms of Use, then intuit that the Terms of Use included some information that mattered to him, and finally click on the Terms of Use and read them carefully before he would ever have been presented with an arbitration clause."); *Goldstein,* 2021 WL 6617447 at *4 (denying motion to compel arbitration the notice in the "Terms and Policies" link was not sufficiently described "so that the user is on notice of the mandatory arbitration provision"); *Tejon v. Zeus Networks, LLC,* 725 F. Supp. 3d 1351, 1354–56 (S.D. Fla. 2024) (finding that the language surrounding the "Terms of Service" link and its placement did not lead a reasonable user to conclude that therein contained an arbitration provision).

(12th ed. 2024) ("A standard course of action that has been officially established by an organization, business, political party, etc."); *Merriam-Webster Online* Dictionary, "policy," https://www.merriam-webster.com/dictionary/policy (last visited November 21, 2025) ("1a: prudence or wisdom in the management of affairs; 1b: management or procedure based primarily on material interest; 2a: a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions; 2b: a high-level overall plan embracing the general goals and acceptable procedures especially of a governmental body").  Indeed, the word policy is not a familiar contract term, but rather, is a word that connotes procedures that might control the conduct of an entity but not an agreement between parties.  The words, of course, matter.  And, here, the Court finds that the words "Our Policy" distinguish this case from *Metro PCS* and from most every case that finds browsewrap agreements enforceable.  Indeed, the Court could not identify any case holding a browsewrap agreement enforceable where the language of the hyperlink was as it is here.  The Dough Finance website simply did not put Lopez on actual notice of the arbitration provision.

Second, the hyperlink at the bottom of the user platform is not prominent.  Indeed, courts routinely find that the hyperlink must be prominent.  For example, in *Fridman v. 1-800 Contacts, Inc.*, this Court denied a motion to compel arbitration and because the hyperlink that appeared at the bottom of the page was "in small font, and the same size and color as the other hyperlinks" and was "not prominent or particularly remarkable" so as to put the plaintiff on notice of the arbitration

provision contained therein.  554 F. Supp.3d at 1261–62 (S.D. Fla. 2021); *see also Nexgen Global, LLC*, 2023 WL 6213583 at *9 (S.D. Fla. Sept. 22, 2023) (finding that the hyperlink that was "in the same font, the same flavorless color (white)" was not sufficient to establish notice).  Similarly, here, the link is located at the bottom of the page, in a small size and non-contrasting color (white) from the rest of the linked material on the page.  *Compare id*. at 1262 *with* ECF No. [10] at 5.  Nor was there any other text that directed Lopez to read the terms contained in the link prior to investing or otherwise interacting with the platform, and Herro does not offer any evidence suggesting that there was any such direction.  *See Fridman,* 554 F. Supp.3d at 1263–64 (citing *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. 4th DCA 2017)) (denying a motion to compel arbitration where a purchaser was allowed to check-out without seeing the hyperlink labeled "terms and conditions"); *Herman v. Seaworld Parks & Entertainment, Inc.*, 2016 WL 7447555 at *5–*6 (M.D. Fla. Aug. 26, 2016) (holding that where a hyperlink titled "Terms and Conditions" was located "at the very bottom of each page of the website" and the defendant "has not demonstrated that there is anything else on the website that would direct reasonably prudent users to view the Website Terms and Conditions," does not establish that a plaintiff was on constructive notice of the arbitration provision).

In his Reply, Defendant argues that the cases Plaintiff cited are distinguishable because they had to do with one single transaction, whereas here, a user's "continuing relationship," and the amount of money being traded on the platform, is sufficient to put users on notice of terms that govern the transaction.

ECF No. [22] at 5–6.   However, this distinction does not exist in this Circuit. Defendant cites to a Ninth Circuit Case, *Keebaugh v. Warner Bros. Entertainment Inc.*, for the proposition that courts regularly enforce browsewrap agreements in "continuing relationship" contexts where users should reasonably expect governing terms. *Id.* (citing *Keebaugh v. Warner Bros. Entertainment Inc.,* 100 F.4th 1005 (9th Cir. 2024)).   In *Keebaugh*, the plaintiff downloaded a mobile gaming application which required its users to press a "Play" button before beginning a game. *Keebaugh* 110 F.4th at 1011–12.   Underneath the "Play" button, the application informed users that by pressing the "Play" button, users agree to the Terms of Use and acknowledge a Privacy Policy.   *Id.* at 1011.   Below this notice, the words "Terms of Use" and "Privacy Policy" appear in two distinct interactable boxes labeled accordingly.   *Id.*   While the Ninth Circuit held that the notice provided was conspicuous, it reasoned that it was the nature of *downloading an app*, as opposed to "simply accessing" a website, paired with the two distinct interactable boxes that made a key difference.   *Keebaugh*, 100 F.4th at 1020.   Here, Plaintiff merely interacted with a website, and no such distinct boxes encapsulated the link to the arbitration provision.   In any event, in the Eleventh Circuit, neither the amount of money at issue nor the sophistication of the user is a determining factor.   The standard is whether a user had "actual notice" or if the link to the terms and conditions are conspicuous enough to put a reasonably prudent person on notice of its terms.   *See Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d. 1252, 1260 (S.D. Fla 2021); *see also Herman v. Seaworld Parks & Entertainment, Inc.*, 2016 WL 7447555 (M.D. Fla. 2016) ("[The]location of the

hyperlink alone (on the bottom of every page) is insufficient to place reasonably prudent website users on inquiry notice of the Website Terms and Conditions"); *Goldstein v. Fandango Media, LLC*, No. 9:21-CV-80466-RAR, 2021 WL 6617447 at \*4 (S.D. Fla. July 27, 2021) (denying a motion to compel arbitration because the browsewrap agreement was insufficient to place a reasonable user on notice that completing a purchase represents a waiver of the user's right to file a lawsuit compelling the defendant's appearance in court.).

In short, the browsewrap agreement did not give Plaintiff actual or constructive notice of the arbitration provision. As a result, the Court finds that Plaintiff cannot be bound by the arbitration agreement. Accordingly, the Motion to Compel arbitration is **DENIED**.

## IV.    MOTION TO DISMISS

As mentioned, Plaintiff's Complaint asserts a total of four counts against Defendant: (i) Negligent Misrepresentation ("Count I"); (ii) Breach of Fiduciary Duty ("Count II"); (iii) Fraud ("Count III"); and (iv) Violation of the Florida Securities and Investor Protection Act ("FSIPA") ("Count IV"). Defendant moves to dismiss all four counts, arguing that Plaintiff has failed to state a claim of relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the Complaint fails to satisfy the heightened Rule 9(b) particularity requirement, and for failure to properly plead elements of each claim. *See generally,* ECF No. [10]. For the reasons stated below, this Court agrees.

## A.  LEGAL STANDARD

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (alteration added) (citing *Twombly*, 550 U.S. at 556).

Although this pleading standard "does not require 'detailed factual allegations,' . . .  it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Twombly*, 550 U.S. at 555.  On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).  Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading.  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Plaintiff's claims for Negligent Misrepresentation (Count I), Fraud (Count III) and violations under FSIPA (Count IV) are each subject to the heightened pleading

standard under Rule 9(b). *See Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1352-3 (S.D. Fla. 2016) (citing *Garfield v. NDC Health Corp.*, 466 F. 3d 1255, 1262 (11th Cir. 2006) (applying FRCP 9(b) standard to claim for negligent misrepresentation); *Absorbezz, L.L.C. v. Hierseman*, No. 19-CV-61442, 2020 WL 6870876, at *2 (S.D. Fla. Nov. 16, 2020) (applying FRCP 9(b) standard to FSIPA claim).

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). More specifically, Rule 9(b) dictates that the complaint must allege: "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Investor Grp. V. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Additionally, Rule 9(b) heightened pleading requires that the plaintiff "allege with particularity the manner in which they relied on the defendants' statements." *Fernau v. Enchante Beauty Prod., Inc.*, 847 F. App'x 612, 622 (11th Cir. 2021) (citation omitted).

**B. ANALYSIS**

<u>Count I (Negligent Misrepresentation) and Count III (Fraud)</u>:  In order to plead a cause of action for negligent misrepresentation or fraudulent inducement, a plaintiff must allege sufficient facts that establish that: "(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely ... on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation." *McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x. 829, 831 (11th Cir. 2013) (quoting *Simon v. Celebration Co.*, 883 So.2d 826, 832 (Fla. 5th DCA 2004)).  For a claim of fraudulent misrepresentation, Plaintiff must show "consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (emphasis omitted); *see Goldstein v. Firer*, No. 1:20-CV-23402-JEM, 2022 WL 17343638, at *6 (S.D. Fla. Nov. 16, 2022), *report and recommendation adopted*, No. 20-23402-CIV, 2022 WL 17344853 (S.D. Fla. Nov. 30, 2022).

Herro argues that Lopez fails to plead his claim for negligent misrepresentation and fraud with sufficient particularity.  ECF No. [10] at 12–15.  More specifically, Herro argues that citing to "vague and ambiguous text messages" does not sufficiently allege when and how the statements were made, how they misled Lopez, or how such statements were false.  *Id*. at 13.  This Court agrees.  The Complaint fails to specify which statements constitute fraud and which statements

Lopez reasonably relied upon on in making his decision to invest. *See, e.g.*, ECF No. [1] at ¶¶29-53; 86–88. Additionally, factual allegations pertaining to Herro's intention to induce Lopez to rely on such misrepresentations are absent from the Complaint, as are factual allegations that would support a finding that Herro should have known that such statements were false. Accordingly, the allegations in the Complaint lack sufficient specificity with respect to Counts I and III.

Count II: Breach Of Fiduciary Duty: "The elements of a claim for breach of fiduciary duty are the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). To survive a motion to dismiss, such a claim must allege facts that "support a causal connection between the alleged [breach of duty] ... and the alleged damages suffered." *Picazio v. Melvin K. Silverman & Associates, P.C.*, 965 F. Supp. 2d 1411, 1415 (S.D. Fla. 2013) (citing to *Bankers Trust Realty, Inc. v. Kluger*, 672 So.2d 897, 898 (Fla. 3d DCA 1996)). "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Turner v. Rocket Mortgage, LLC*, No. 24-10012, 2025 WL 1377413, at *5 (11th Cir. May 13, 2025). A fiduciary relationship may be implied and "premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). "Florida Courts have construed the term 'fiduciary or confidential relation' as being very broad." *Ducat Florida, LP v. Wells Fargo Bank, N.A.*, No. 12-23683-CIV, 2014 WL 11878362, at *2

(S.D. Fla. Jan. 13, 2014)(citing *Linville v. Ginn Real Estate Co., LLC*, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010). Since Florida courts typically have a broad interpretation of a fiduciary relationship, "a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6) because it is often impossible to say that a plaintiff will be unable to prove the existence of a fiduciary relationship." *Catano v. Capuano*, 2020 WL 639406, at *12 (S.D. Fla. Feb. 11, 2020) (citing *Reuss v. Orlando Health, Inc.*, 140 F. Supp. 3d 1299, 1304 (M.D. Fla 2015)).

Herro argues that Lopez has failed to sufficiently allege that a fiduciary relationship existed between them. ECF No. [10] at 13–4.   In his response, Lopez argues that Herro took on the role of a fiduciary when he took Lopez under his wing to show him the "ins-and-outs" of looping. ECF No. [14] at 19. Lopez argues that the Complaint sets forth facts supporting a finding that Lopez placed his trust in Herro when Herro showed him how to utilize the "looping" feature, and how to maximize his profits by looping. *Id.*; *see also* ECF No. [1] at 40–41. Indeed, the Complaint also alleges facts to support that Herro took on this role, counseling Lopez via text message, FaceTime calls and voice messages, and offering to check his work to ensure he was using the looping technique correctly, and generally encouraging Lopez to trust in the Dough Finance platform. ECF No. [1] at ¶¶38–44.

The Court finds that there are sufficient facts alleged which, taken as true, show that Herro had a fiduciary duty based on his involvement with Lopez's investment and use of the looping feature. *See Turner*, 2025 WL 1377413 at *5; *see also Wight v. Bluman*, No. 20-81688-CIV, 2021 WL 8999536, at *5 (S.D. Fla. Feb. 4,

2021) (finding a fiduciary relationship existed when plaintiffs hired Defendant based on their relationship of "reposed trust and confidence"). However, and as discussed below, Lopez's Complaint falls short of the causation element and accordingly, fails to state a claim of relief for Count II.

Herro argues that Lopez does not sufficiently allege proximate causation because it was the flash loan hack, not Herro, that was the proximate cause of Lopez's losses. ECF NO. [10] at 14. In his Response, Lopez argues that it was Herro's assurance in the platform's liquidity that caused his loss because but for those misrepresentations, he would not have invested. ECF No. [14] at 17–18.

The Complaint's factual allegations as to proximate cause on this count are conclusory. The Complaint states, "as a proximate cause of the foregoing, [Lopez] has been injured . . . ." ECF No. [1] at ¶ 83. In Lopez's response, he argues that "but for [Herro's] misrepresentation, [Lopez] would not have invested." ECF No. [14] at 18. The Complaint, and Lopez's Response are unclear as to what the breach was, and how the damages that resulted from Herro's breach of fiduciary duty were a foreseeable and natural consequence of that breach. Accordingly, the Court finds that Lopez fails to state a claim for Count II.

Count IV: Violation Of FSIPA:   Plaintiff argues that Herro committed numerous violations of Section 517.301(1) of the Florida Securities and Investor Protection Act ("FSIPA"). ECF No. [1] at ¶113. Section 301 of the FSIPA states that it is unlawful for an individual "in connection with the offer, sale, or purchase of any investment or security" to do any of the following: (1) "employ any device, scheme, or

artifice to defraud;" (2) "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;" or (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011) (citing Fla. Stat. § 517.301(1)(a)(1)-(3)). "In order to state a claim of a violation of Section 301 of the FSIPA, a plaintiff must allege the following: (1) that a defendant made a misstatement or omission (2) of a material fact (3) with scienter (4) upon which the plaintiff relied." *Arnold*, 839 F. Supp. at 1286. The threshold question for the Court is what the security or investment at issue is.

Herro argues that Lopez has failed to allege sufficient facts to state a claim under the FSIPA because Lopez fails to allege that Herro solicited Lopez to buy a security, nor is the Complaint sufficiently clear on what the security is. ECF No. [10] at 17. Lopez's Response states that the Complaint "generally alleges" that Lopez's investment and other financial activity on Dough Finance amounted to a purchase of a security interest" under the FSIPA. ECF No. [14] at 20. To this, however, Herro's Reply notes that even if the Court considers Lopez's investment to be a "security," the FSIPA claim would still fail the *Howey* test. The Court agrees.

In *S.E.C. v. W.J. Howey Co.*, the Supreme Court established the classic test for determining whether a transaction is an "investment contract" within the meaning of Section 2(a)(1) of the Securities Act, and in this case, as defined under the FSIPA.

328 U.S. 293, (1946); s*ee S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999); *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1147 (Fla. 3d DCA 2001)("Florida courts will look to interpretations of the federal securities laws for guidance in interpreting Florida's securities laws."). In the Eleventh Circuit, the *Howey* test has three elements: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

It is unclear, as plead, what allegations in the Complaint support the second and third prongs of the *Howey* test. The Complaint alleges that Lopez both invested his 1,000,000 worth of Etherium, and also tendered money "to participate in the 'pools' of investors whose crypto assets were then combined by smart contracts and made available for borrowing or 'looping[,]' which results in the returns earned by each investor. *Id.* at ¶¶ 100–104. It is unclear what financial activity on the Dough Finance platform is being alleged as a security, or how the profits are derived "solely from the efforts of others," if the process itself is automated by self-executing contracts through the "looping" feature. *See id.* As such, this Court finds that the Complaint lacks factual allegations that would constitute a FSIPA violation, and Lopez has failed to state a claim for Count IV.

## V.     CONCLUSION

Accordingly, for the foregoing reasons, as well as those articulated on the record at the Hearing, it is hereby **ORDERED AND ADJUDGED** that the Motion, ECF No. [10], is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendant's Motion to Compel Arbitration is **DENIED.**

2. Defendant's Motion to Dismiss as to Counts I, II, III, and IV is **GRANTED WITHOUT PREJUDICE**.  Plaintiff may file an Amended Complaint by no later than **TEN DAYS** from the date of this Order.

**DONE AND ORDERED** in Miami, Florida on this 2nd day of December, 2025.

_____
**JACQUELINE BECERRA**
**UNITED STATES DISTRICT JUDGE**